Kenneth R. Heusey, *pro se*
109 Smithfield Street
Pittsburgh, PA 15222
T: (310) 963-6772
E: kenheusey@gmail.com



FILED
CLERK, U.S. DISTRICT COURT

SEP – 2 2014

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# United States District Court
## For the
## Central District of California

KENNETH HEUSEY, Plaintiff

- against -

LA CV 14 06810-AB (Ex)

14-CV _____

ROLAND EMMERICH;
        CENTROPOLIS ENTERTAINMENT;
ANONYMOUS PICTURES
JOHN ORLOFF;
PETER NORTHBOURNE JAMES;
PETRA HOLTORF STRATTON;
RELATIVITY MEDIA;
UNCHARTERED TERRITORY;
SONY PICTURES ENTERTAINMENT, INC.;
        Parent company of COLUMBIA PICTURES INDUSTRIES, INC.,
        *Defendants*

Copyright
Infringement
COMPLAINT

**DEMAND FOR JURY TRIAL**



PAID

SEP – 2 2014

Clerk, US District Court
COURT 4612

## PLAINTIFF'S COMPLAINT
## COPYRIGHT INFRINGEMENT & OTHER CLAIMS

1

# TABLE OF CONTENTS

1)   JURISDICTION AND VENUE                                    p. 3

2)   NATURE OF THIS SUIT                                        p. 4

3)   THE PARTIES                                                p. 5

4)   THE FACTS                                                  p. 9

5)   ACCESSS TO PLAINTIFF'S WORK                                p. 15

6)   DEFENDANTS' ALLEGED CREATION OF "ANONYMOUS"   p. 19

7)   A PARTIAL LIST OF SIMILARITIES                             p. 37

8)   CLAIM I:  Direct Copyright Infringement                   p. 49

9)   CLAIM II:  Contributory Copyright Infringement            p. 51

10)  CLAIM III:  Vicarious Copyright Infringement              p. 52

11)  CLAIM IV:  Fraud                                           p. 55

12)  CLAIM V:  Conversion                                       p. 57

13)  CLAIM VI:  Unfair Competition                             p. 58

14)  CLAIM VII:  Unjust Enrichment                             p. 60

15)  REQUEST FOR RELIEF                                         p. 61

16)  SPOLIATION NOTICE                                          p. 66

17)  DEMAND FOR JURY TRIAL                                      p. 66

18)  VERIFICATIONS                                             p. 67

19)  CERTIFICATE OF SERVICE                                    p. 68

## JURISDICTION AND VENUE

1.     This action arises under the Copyright Act of 1976 (hereinafter "the Copyright Act"), 17 U.S.C. §§ 101 et seq.

2.     This action is brought, and subject matter jurisdiction lies within this Court, pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.     This Court has federal question jurisdiction in this matter in that Plaintiff seeks damages against the Defendants named herein under Sections 501 through 505 of the Copyright Act of 1976, 17 U.S.C. §101 et seq. The Court has pendant jurisdiction over any claims asserted herein which arise under state law in that such claims flow from a common nucleus of operative fact.

4.     Venue lies within this Court pursuant to 28 U.S.C. Sections 1391 (b)(1) – (3), 1391(c), 1391(d), and 1400(a) in that the majority of Defendants reside for venue purposes and are subject to personal jurisdiction in this District, and that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Central District of California. In particular, on information and belief, the majority of the individual Defendants reside in the United States, though one, on information and belief (Roland Emmerich) is a German national. Therefore all can be sued in any district, including this District.

1    Plaintiff Kenneth Heusey brings this suit against Defendants,

2    alleging the following:

3                              **NATURE OF THIS SUIT**

4    5.    This is an action for copyright infringement under the legal causes

5    of action of Direct Copyright Infringement, Contributory Copyright

6    Infringement, Vicarious Copyright Infringement, and related complaints,

7    including  Fraud,  Unfair  Competition,  Unjust  Enrichment,  and

8    Conversion arising out of the Defendants willful and deliberate copying,

9    and exploitation of elements of the original screenplay, "Not Without

10   Justice," (the Work) developed and written by Plaintiff, and used,

11   without  express  or  implied  permission  in  the  acclaimed,  though

12   apparently  not  highly  financially  successful  motion  picture

13   "Anonymous" without any work credited to Plaintiff and with no

14   compensation of any kind to Plaintiff. Defendants had been in the movie

15   business for many years, thus knew that they were violating Plaintiff's

16   rights. Defendants aggressively obtained access to the Work, and

17   ultimately knowingly violated Plaintiff's rights. Defendants profited

18   severally from their infringing activities by the fees and income received

19   for their various contributions to the development and production of

20   the infringing work.

4

1

**THE PARTIES**

2    6.    Plaintiff Kenneth Heusey (Heusey) is a citizen of the United States

3    residing in Pittsburgh, PA and is a screenwriter and successful visual

4    artist. Starting the Work sometime in 1996, continuing with four years

5    of research and development while living and working in Los Angeles,

6    the Plaintiff completed the Work in April 2000. He intended the Work to

7    be his entrée into the Hollywood "Above the Line" community.   The

8    script focused on the alleged murder of Christopher Marlowe by William

9    Shakespeare, and William Shakespeare's strategic use of his pen and

10   words to influence the politics surrounding the succession to the dying,

11   heirless Queen Elizabeth I.   Plaintiff currently has six film projects in

12   various stages of development.

13   7.    Defendant Roland Emmerich (Emmerich), on information and

14   belief, is a German national residing in Los Angeles, CA.  On information

15   and belief, he is a successful film director, screenwriter, and producer,

16   known for his action films, and represented by Creative Artist Agency.

17   His salary for "Independence Day"(1996) is reported on *IMDb.com* as

18   $7,500,000. His salary for his work on the movie "2012" (2009) was

19   $70,000,000. On information and belief, Emmerich co-produced, and

1    directed "Anonymous," as well as co-wrote the script with Defendant
2    John Orloff, though Emmerich was not credited as such.

3    8.    Defendant Sony Pictures Entertainment, Inc. (Sony Pictures) is the
4    American entertainment subsidiary of the Japanese multinational media
5    and technology conglomerate Sony Corporation, with its principal place
6    of business in Culver City, CA. It encompasses Sony's motion picture,
7    television production, and distribution units. On information and belief,
8    at the time of the instigating action Defendant Emmerich's company
9    Centropolis Entertainment and/or Centropolis Effects operated at the
10   Sony studio lot in Culver City.

11   9.    Defendant Columbia Pictures, Inc. (Columbia Pictures) is an
12   American film production and distribution studio, a division of the
13   Columbia TriStar Motion Picture Group, a division of Sony Pictures
14   Entertainment, a subsidiary of the Japanese conglomerate Sony, with its
15   principal place of business is Culver City, CA..  On information and belief,
16   Columbia Pictures was and is a distributor of the infringing work.

17   10.   Defendant Centropolis Entertainment, on information and belief,
18   is a privately held company founded by Defendant Emmerich with its
19   principal place of business in Los Angeles, CA.   On information and
20   belief, Defendant Centropolis Entertainment is and was at all times

1    material to this action as one of the production companies producing

2    the infringing work.

3    11.   Defendant Anonymous Pictures, on information and belief, is a

4    privately held company with its principal place of business in London,

5    England.  On information and belief, Defendant Anonymous Pictures is

6    and was, while in existence, at all times material to this action as one of

7    the production companies producing the infringing work.

8    12.   Defendant Relativity Media, LLC on information and belief, is a

9    limited liability company with its principal place of business in Beverly

10   Hills, CA.  On information and belief, Defendant Relativity Media was

11   involved in the financing and distribution of "Anonymous."

12   13.   Defendant Studio Babelsberg Motion Pictures, GmbH, on

13   information and belief, is a limited liability company with its principal

14   place of business in Potsdam, Germany.   On information and belief,

15   Defendant Studio Babelsberg Motion Pictures was involved in the

16   financing and distribution of "Anonymous."

17   14.   Defendant John Orloff (Orloff), on information and belief, was and

18   is a United States citizen, now residing in Spencertown, NY.   On

19   information and belief, Orloff is a screenwriter associated with the

20   Writers Guild of America, West, and represented by agent John Campisi.

1   On information and belief, Orloff allegedly wrote the screenplay for

2   "Anonymous," working closely with Defendant Emmerich on its

3   development. On information and belief, Defendant Orloff is and was at

4   all times material to this action.

5   15.  Defendant Peter Northbourne James (James) on information and

6   belief, was and is a United States citizen, now residing in Marina del Rey,

7   CA. On information and belief, James is and was a visual effects

8   supervisor, who had been working with Centropolis Entertainment at

9   least as far back as the production of "Independence Day."  On

10  information and belief, Defendant James is and was at all times material

11  to this action.

12  16.  Defendant Petra Holtorf-Stratton (hereafter simply Holtorf) on

13  information and belief, was a German national at the time of the

14  instigating actions, now married and a resident of Los Angeles, CA.  On

15  information and belief, Holtorf was a visual effects supervisor, now also

16  a producer. On information and belief, Holtorf was working with

17  Defendant Emmerich, assisting on the development of "Anonymous."

18  On information and belief, Defendant Holtorf is and was at all times

19  material to this action.

8

17.   The Plaintiff, in reliance on the integrity of our justice process and its truth seeking mission, prays that the Court will consider this case on its merits, being somewhat lenient in regards to its form, as he has independently developed the case in three weeks after diligently seeking legal counsel over the last three years, and after apparent conflicts of interests between at least one of the Defendants and the attorney who had (wrongly) committed to the case, prohibited his involvement.  The Plaintiff certainly saw no benefit to filing this at the final hour, though the Plaintiff has compiled and written this Complaint, starting only three weeks before its Statue of Limitations would preclude its hearing.

**THE FACTS**

18.   After working various positions in the Hollywood film and photo industries, learning the logistics of production, sometime early in 1996 Heusey decided to develop his own projects.   He chose to write his own screenplay so that he could control the property, deciding to first explore a notion that he'd had for years that Shakespeare had hidden "something" in his renowned play "Hamlet." Not having a specific story hook, Heusey began by re-reading Hamlet and patiently researching Shakespeare's life and the life happening around Shakespeare in

1    Stratford and London.   When Heusey began noticing clues pointing to

2    the possibility that Shakespeare was involved in the death of Marlowe,

3    he had found his hook, but then needed to find or prove "motivation."

4    He found Shakespeare's motivation in the politics surrounding the dying

5    Queen. At that time, no literary or historical reference could be found

6    that directly stated – or even implied - that Shakespeare had killed

7    Marlowe.   Heusey found only incidental clues buried in books about

8    other topics. Because of the unique nature of this inquiry, Heusey

9    invested four years, continuing research of historical and fictional books

10   relating to Shakespeare, Marlowe, Essex, and Queen Elizabeth, as well as

11   various famous and obscure works by Shakespeare and Marlowe. In

12   December 1999 Heusey ventured to London, Stratford, Cambridge and

13   Canterbury with a specific agenda.  Able to explore primary sources and

14   observe various contexts, Heusey had found the answers to his final

15   questions – satisfying his theory and providing unique material for his

16   Work.   Heusey traveled home to Los Angeles to finish writing "Not

17   Without Justice."   The Work's title is from Shakespeare's family motto,

18   "Non Sans Droit," which more accurately translates from Latin to "Not

19   Without Right."

19.   Plaintiff completed the first draft of the Work and immediately applied for copyright registration and made the required deposit in April 2000.   Copyright was granted without qualification or exception. Plaintiff owns and administers the copyright in Plaintiff's Work.

20.   Prior to registration in the United States, Plaintiff's Work was known by a select few. While continuing to refine the screenplay, Heusey developed two possibilities: *producing the film* or *selling the rights* to his unique Work.   A few examples of his efforts to produce the film based on the Work include scouting locations on both the east and the west coasts, and hiring a professional line producer to create a general breakdown of the script.  Heusey had also stayed in touch with a woman in London with contacts in the film industry there, should he and/or future co-producers choose to shoot there.   Recognizing that he had no major producing credits under his belt, Heusey also went about looking for an appropriate co-producer.   During this development process, Heusey knew that his Work was vulnerable (as you cannot copyright concepts), so he was cautious in his dealings, requiring even friends to sign a confidentiality agreement before presenting "Not Without Justice" for consideration.

11

21.   In May 2000 Jay Mimm, a colleague in the Celebrity and Fashion photography industries offered to make an introduction to Gottfried Tollman, then owner of Miauhaus Studios on La Brea Avenue in Los Angeles. Tollman introduced Heusey to visual effects supervisor, Defendant Peter Northbourne James, who had worked for many years as an independent contractor with Centropolis Entertainment. Defendant James represented that he would create a breakdown of the script listing potential visual effects shots and subsequently generate a proposed budget for the visual effects work.  Defendant James signed a confidentiality agreement, but subsequently – against explicit written and verbal direction to the contrary – forwarded the screenplay to Defendants Holtorf of Centropolis Entertainment. (details of this interaction to follow below.) Heusey continued taking many meetings well into 2002, but interest in the project ground to a halt, so he shelved the Work to pursue other projects.

22.   On September 2, 2011 Tasha Brown, who was to have been Heusey's liaison to London, but who hadn't been in communication for many years, found Heusey via Facebook, presuming that a film being promoted in London, "Anonymous," was the culmination of Heusey's efforts.   Heusey who was now residing in Pittsburgh, PA, developing

1   other projects, was able to find video previews of "Anonymous" online.

2   Centropolis Entertainment's "Anonymous" previews emphasize the

3   theme of the "pen being mightier than the sword" and the story of

4   William Shakespeare's entanglement in vicious Elizabethan politics –

5   both elements substantially similar to Heusey's Work. Heusey

6   immediately began calling his Los Angeles contacts asking for

7   recommendations for an attorney, as well as exploring possibilities in

8   the Pittsburgh area.   Heusey also reserved a ticket to the second

9   screening of "Anonymous," which was to have premiered at the Toronto

10  Film Festival on September 17, 2000.  Standing in the rear of the packed

11  theatre, Heusey watched with a mixed sense of pride and frustration as

12  the characters played out many of the scenarios that he had imagined

13  and described in "Not Without Justice."   As will be detailed later, the

14  writers and producers of "Anonymous" were careful not to copy "Not

15  Without Justice" exactly, and they were careful to use historical events,

16  however they were reckless in their use of the substantially similar

17  creative elements of Shakespeare's involvement in - and the influence of

18  his pen, his plays, and his words - over the politics of the day, as well as

19  their similar selection and arrangement of many historical elements.

20

13

### Producer's Guild definition of PRODUCER

23.   Subject to the control of the Owner, the "Produced by" would have significant decision-making authority over a majority of the producing functions across the four phases of a motion picture's production. Those phases are: Development; Pre-Production; Production; and Post-Production & Marketing. The following considerations would be taken into account in determining "Produced by" credit:

- Within the development process, the "Produced by" will typically conceive of the underlying premise of the production, or select the material. S/he also will select the project's writer, secure the necessary rights and initial financing, and supervise the development process.

- In pre-production, the "Produced by" will typically select the key members of the creative team, including the director, co-producer, cinematographer, unit production manager, production designer, and principal cast. The "Produced by" also will participate in location scouting, and approve the final shooting script, production schedule, and budget.

1 • During production, the "Produced by" will supervise the day-to-

2 day operations of the producing team, providing continuous,

3 personal, and usually "on-set" consultation with the director and

4 other key creative personnel. S/he also will approve weekly cost

5 reports, and continue to serve as the primary point of contact for

6 financial and distribution entities.

7 • For the last phase, post-production & marketing, the "Produced

8 by" is expected to consult personally with post-production

9 personnel, including the editor, composer, and visual effects staff.

10 S/he is expected to consult with all creative and financial

11 personnel on the answer print or edited master, and usually is

12 involved in a meaningful fashion with the financial and

13 distribution entities concerning the marketing and distribution of

14 the motion picture in both domestic and foreign markets.

15 **ACCESS TO PLAINTIFF'S WORK**

16 24. Plaintiff alleges that the Defendants acquired the property for

17 their production of "Anonymous" by aggressively acquiring Plaintiff's

18 Work. Defendants had access to and copied Plaintiff's protected

19 expression in what amounts to theft of Heusey's Work. As introduced

15

1    above, Defendant James had been introduced to Heusey by Gottfried

2    Tollman.  Representing himself as a visual effects supervisor who would

3    create a breakdown of shots that could be best accomplished through

4    use of Computer Generated Imagery (CGI) and subsequently a proposed

5    budget, James signed a confidentiality agreement on May 16, 2000, and

6    then Heusey gave him a printed copy of his Work to read so that James

7    could accomplish the agreed upon tasks. Upon reading the script, James

8    suggested to Heusey that Centropolis Entertainment would certainly be

9    interested in reading "Not Without Justice." Heusey welcomed the

10   possibility, but insisted that a representative of Centropolis would need

11   to sign a Confidentiality/Non-Compete Agreement before he would

12   submit the screenplay for the consideration of Defendants Emmerich

13   and Centropolis Entertainment. James more than once persisted,

14   "advising" that wasn't how it was done and that Heusey should take

15   advantage of this opportunity, further stating that he knew the people at

16   Centropolis well and they would not take advantage of him in any way.

17   Heusey was certainly tempted by the opportunity, but James repeated

18   insistence to give the script to Centropolis Entertainment for their

19   consideration indicated an agenda on his part, creating immediate

20   concern for Heusey, who continued to insist that any third party would

16

1   need to sign a Confidentiality/Non-Compete Agreement. Furthermore,

2   Heusey continued to press for the visual effects breakdown; on August

3   31, 2000 Defendant James asked for a revised script.

4        On September 16, 2000, Defendant James informed Plaintiff

5   Heusey that he had given the Plaintiff's Work to Defendant Holtorf

6   without having asked her to sign a Confidentiality/Non-Compete

7   Agreement. Plaintiff expressed his anger at this revelation, to which

8   Defendant James had little to say.  Heusey surmised that once Holtorf

9   read the Work, wrongfully obtained or not, Centropolis Entertainment

10  had the benefit of its contents.  He decided to schedule a meeting with

11  Centropolis Entertainment in attempt to salvage a reasonable fee for the

12  Work, or perhaps negotiate a co-production. Plaintiff's log notes

13  indicate that the meeting between Plaintiff and Defendant Holtorf

14  occurred at 7:00 on October 10, 2000 at the Centropolis Entertainment

15  office on the Sony Lot in Culver City. On behalf of Centropolis

16  Entertainment, Holtorf made an offer of a small fee and no promise of

17  future involvement or credit in the production – which Heusey refused.

18  When he attempted to negotiate, Holtorf indicated that their offer was

19  "take it or leave it."  Heusey then demanded that Holforf sign a

20  Confidentiality/Non-Compete Agreement, which she refused. The

17

1    meeting was short and less than friendly, but at their parting, Defendant

2    Holtorf handed back to Heusey the pilfered hard copy of the script, on

3    which he immediately observed notes on every page, handwritten in

4    German. The significance of this is that Defendant Emmerich is German,

5    as was Holtorf. On information and believe, at that time Holtorf's grasp

6    of English was stronger than Emmerich's, so she was providing notes to

7    him.   Most of the notes are simple translations, but some of them

8    express significant subjective opinions of various elements (including

9    the notion that Shakespeare was "whoring around"). Also, the brass

10   brads were bent, indicating that the bound script had been taken apart

11   to facilitate copying.  Heusey never did receive a breakdown or budget

12   from Defendant James.  Heusey never spoke with James, Holtorf, or any

13   of the Defendants ever again. As there was no "injury" at the time,

14   Heusey did not pursue a lawsuit of any kind.  He was watchful for a

15   while, but learned to trust that no projects were being developed based

16   on his Work. Heusey does possess the printed, annotated (in German)

17   script, as proof of access.

18   25.   Plaintiff asserts that he did not "submit" the script for Defendants'

19   consideration for purchase or co-production. It was stolen. Plaintiff's

20   Confidentiality/Non-Compete Agreement with Defendant James was

1   intended by Plaintiff to facilitate working with him as an independently

2   contracted visual effects supervisor. On information and believe,

3   Plaintiff asserts that Defendant James never intended to create a

4   breakdown or budget for visual effects, and that James fraudulently

5   misrepresented his intent and failed to disclose to Plaintiff his

6   knowledge of Centropolis Entertainment's and Defendant Emmerich's

7   desire to access the script about William Shakespeare.

8   26.   There are no elements of contract law in this suit.  There was no

9   implied contract with Centropolis Entertainment; only theft. The later

10  interactions with Defendants James and Holtorf certainly made it clear

11  that Plaintiff considered their actions to be theft.  These interactions as

12  well as the Confidentiality/Non-Compete Agreement signed by James

13  are also evidence that Heusey valued his unique intellectual property

14  and intended to be paid well for it.  Heusey will assert herein a claim for

15  fraud, with one of the hoped-for effects being the rescission of the

16  Confidentiality/Non-Compete Agreement signed by Defendant James

17  and viewing that interaction and its effects in a new light.

18  **DEFENDANTS' ALLEGED CREATION OF "ANONYMOUS"**

19  27.  On information and belief, Plaintiff does not dispute that

20  Defendant Orloff allegedly wrote "Soul of the Age," completing it

19

1    sometime in 1998 and subsequently pitching it to various production

2    companies (nearly concurrent with Heusey's efforts to pitch his Work).

3    Defendant Orloff allegedly did his own research and then wrote a story

4    that focused only on the Shakespeare authorship question. Orloff speaks

5    with *IAmRogue.com* regarding what gave him the idea to turn the

6    Shakespeare authorship question into "Soul of the Age":

7        Orloff: "Well more than twenty years ago, in 1989 I saw a

8    Frontline episode on PBS...I was like, wait a minute, what? So I read

9    some books and I was fascinated by it. I thought it would make an

10   amazing film except I didn't know how to write it...so I moved on in my

11   life, then about five or six years later my then girlfriend, now wife,

12   finally just said, 'You know what? If you don't write it, somebody else is

13   going to, so you better get to it, brother.' So I wrote it and did a ton of

14   research, not just researching the authorship issue, but also Elizabethan

15   England, politics, speech craft and everything I could read."

16   28.   In a *New York Times* interview dated October 23, 2011, Orloff

17   says, "In a move atypical of Hollywood, Mr. Emmerich, not the studio,

18   buys the screenplays for the movies he's directing. That allows him total

19   control."

1    29.   On information and belief, Defendant Emmerich became familiar

2 with Orloff's script "The Soul of the Age," subsequently purchasing the

3 screenplay from him in 2002, or 2003; the timing of his awareness and

4 of his purchase are in question; this presents an issue of material fact,

5 considering the importance of prior knowledge when verifying

6 independent creation.  The following interviews, though contradicting

7 themselves in many important ways to be discussed, agree that the

8 purchase of Orloff's "Soul of the Age" and Orloff's and Emmerich's

9 subsequent development of the that script into the script for

10 "Anonymous" happened sometime after October 10, 2000, the date that

11 Heusey met with Centropolis Entertainment representative Petra

12 Holtorf.  Plaintiff presents an interview by ComingSoon.net of producer

13 Roland Emmerich in early 2012:

14    a.  CS: "One thing I never learned when we spoke in Toronto was

15 how you originally found this script. I know you had been developing it

16 for years but how did you and John first hook up?"

17    b.  Roland Emmerich: "Just as a reading sample, because I was

18 looking for a writer for 'The Day After Tomorrow,' and my agency sent

19 certain writers over, and one of them was John Orloff, and my first talk

20 with him, I said, 'What else have you written?' Then he said, 'Oh, I

21

started my career with this script called 'Soul of the Age." I said, 'What is that?' 'It's just about William Shakespeare didn't write his plays.' I said, 'What? Can you send it to me?' He sent it to me and I fell in love, it was like love at first sight."

c. CS: "This must have been at least ten years ago."

d. Emmerich: Yeah, this was like ten years ago. Then I realized that it was with another company, so I first had to wrestle it out from their hands - took me a year - and then I kind of bought it with my own money and started developing with John together. Poor John had to write 20 versions of this thing.

e. CS: "Twenty versions of a script in Hollywood is not a lot. "

f. Emmerich: "No, but with the same writer, it's unusual. I would say that you're right, but I don't like to work with different writers. I always stick with my main writer who created the thing and he has to see it through to the end. I'm a writer myself. I know how hard it is to have somebody rewrite you."

30.   In another interview in 2012 with Mark Anderson for Anderson's *shakespearebyanothername.blogspot*, Orloff has a different story:  Orloff first describes that he took many meetings for "Soul of the Age," starting in 1998, but no producers wanted to develop it. Orloff then describes

1  having expressed surprise at receiving a call from his agent informing

2  him that Emmerich wanted to meet with him. Orloff continues, "But [my

3  agent] said, 'Yeah, but he's heard a lot about you. He really wants to

4  meet you.' This was 2002 or '03. We sat down in Emmerich's office, and

5  we talked about 'The Day After Tomorrow.' Which sounded totally cool.

6  But it also sounded like a movie I didn't understand as a writer...I said,

7  'I'm so flattered that you think I can do this. I'm not sure I can. And I

8  think quite frankly you can get a lot of writers who are way better than

9  me for this kind of material.' He said, 'Well, what else have you written?'

10  ...And I start doing my spiel (describing "Soul of the Age"). And I could

11  see he was really interested. He said he wanted to read it. And about a

12  week or two later, my agent called me up and said, 'Hold on to your seat.

13  Roland Emmerich wants to buy your script.'"

14  According to *shakespearebyanothername.blogspot* on November 11,

15  2011, Orloff stated, "'Soul of the Age' thankfully got me a lot of attention

16  and meetings in Hollywood...But nobody wanted to buy it. But luckily

17  one of those meetings was with Tom Hanks. And that changed my life."

18  (it landed him two  Band of Brothers episodes in 2001).  After his work

19  on Band of Brothers, Orloff had no further credits prior to his meeting

20  with Emmerich.  Emmerich is the master of disaster action film and

1    generally writes or co-writes his films, generally with a writer that

2    compliments his skill set.  On information and belief, he would have been

3    looking for a writer to write the characterization and emotion of the

4    story, which Orloff was known for, and yet Orloff supposedly declines

5    the possibility to write for "The Day After Tomorrow."  In an October 27,

6    2011 *IndieWire* article by Anne Thompson, Orloff says, "So the script

7    became this calling card, getting me lots of meetings. Until one day,

8    about 10 years ago, I was sitting in Roland Emmerich's office because he

9    wanted to talk to me about 'The Day After Tomorrow."  At the meeting,

10   Orloff exclaimed to Emmerich, "I don't know how to write that! And you

11   don't want to hire me for that." Orloff claims that Emmerich then said,

12   "What else have you written?" Orloff claims to have then taken the

13   opportunity to pitch "Soul of the Age."

14   31.  On information and belief, Defendant Emmerich was not in the

15   market for a writer at that late date. Emmerich was already co-writing

16   his screenplay with screenwriter Jeffrey Nachmanoff  (Nachmanoff)

17   when he claims to be interviewing writers for the job. In an interview

18   compiled by Jack Foley for *www.indielondon.co.uk*, Nachmanoff says, "It

19   was a real privilege for me to be able to work with (Emmerich)...Roland

20   and (producer) Mark had me involved throughout the entire picture. I

24

1   was brought on set the whole way, I've been involved in the editing and

2   now I'm here to help promote the film." Furthermore a production note

3   indicates that Emmerich and Nachmanoff had been writing a scene

4   imagining the collapse of Larsen B ice shelf "a few weeks" before its

5   collapse, which started at the end of January 2002...completing its fall

6   into the sea on March 7, 2002. This places Nachmanoff's involvement as

7   a writer on "The Day After Tomorrow" at least as early as mid February

8   2002. In an earlier account Emmerich claims to have met Orloff while

9   interviewing writers for "The Day After Tomorrow."   On information

10   and belief, Emmerich began independently writing that script before

11   September 11, 2001. He stopped writing after the "9/11" attacks,

12   uncertain whether to proceed with a film about the destruction of New

13   York City.   This later account describes Emmerich actively developing

14   the script with Nachmanoff no later than mid-February 2002.

15   Subsequently Nachmanoff remained with the production through its

16   completion. On information and belief, Emmerich has fabricated the

17   story about meeting with Orloff to discuss involvement in "The Day

18   After Tomorrow."   Plaintiff alleges that Emmerich met with Orloff,

19   whose "Soul of the Age" was circulating Hollywood, so that he could

20   control a prior work for which he could perhaps claim independent

1   creation, written without prior knowledge of Plaintiff's Work - and

2   subsequently add the dramatic and marketable political elements – the

3   bitter conflict of the various parties vying to control England upon the

4   Queen's death - that he had found in Plaintiff's Work.  Alternatively, in

5   the narrow window between October 2001 and January 2002,

6   Emmerich meets with Orloff, falling in love with and stating intention to

7   purchase "Soul of the Age", the content of which he immediately nearly

8   discards or subverts to the content and style of "Not Without Justice."

9   The Plaintiff prays that, facilitated by the discovery process, access to

10   specific contracts and records will clarify this phase of Emmerich's

11   development of his acquired property, the Plaintiff's Work.

12   32.   In all accounts thus far, Emmerich's purchase of Orloff's script and

13   his involvement in its development begins after Centropolis had access

14   to Plaintiff's script.   On information and belief, Emmerich claims

15   responsibility for the infusion of the substantially similar political

16   themes and subplots – all the substantially similar elements that,

17   Plaintiff alleges, Emmerich had found in Plaintiff's Work sometime

18   certainly after Centropolis Entertainment had access to Plaintiff's Work

19   in October 2000. (as described in more detail later).  Plaintiff asserts

20   that as a producer, Emmerich fraudulently "acquired" Plaintiff's Work,

1   which included the action elements that he is known for and specifically

2   set out to meet with Orloff, who was making the rounds in Hollywood

3   with his "Soul of the Age."

4   33.   In a November 2009 interview, Emmerich said of "Anonymous":

5        a.  Emmerich: "For me there was an incredible script that I bought

6   eight years ago. It was initially called 'Soul of the Age' which pretty

7   much is the heart of the movie still. It's three characters. It's like Ben

8   Jonson, who was a playwright then William Shakespeare who was an

9   actor.  It's like the 17th Earl of Oxford who is the true author of all these

10  plays.  We see how, through these three people, it happens that all of

11  these plays get credited to Shakespeare. I kind of found it as too much

12  like 'Amadeus' to me. It was about jealousy, about genius against end, so

13  I proposed to make a movie about political things, which is about

14  succession.  Succession, the monarchy, was absolute monarchy, and the

15  most important thing was who would be the next King. Then we

16  incorporated that idea into that story line."  This article written in 2009

17  places Defendant Emmerich's alleged purchase and transformation of

18  Orloff's script in 2001. If Emmerich spent a year "wrestling" Orloff's

19  script from another producer's control, this would indicate that he met

20  with Orloff sometime in 2000, well before he was interviewing writers

27

1    for "The Day After Tomorrow," near the time that Defendant James had

2    given Plaintiff's Work to Defendant Centropolis Entertainment's

3    representative, Defendant Petra Holtorf. Plaintiff asserts that it is more

4    traditional for producers to "option" screenplays that they know will be

5    developed, rather than offering to purchase them outright two weeks

6    after being introduced to the screenplay. Furthermore in this account,

7    Emmerich acknowledges the substantial importance of the political

8    elements, including the brutal rivalry for the succession to the dying

9    Queen embodied throughout the Defendants' project.   But in later

10   interviews, the alleged timing and sequence of events seems to shift.

11   Emmerich and Orloff continue to contradict each other and themselves

12   about the timing and who was responsible for what.

13   34.   On information and belief, Emmerich privately and publicly takes

14   credit for the creation of the new and *substantial* political elements that

15   Emmerich and Orloff collaborate to build into their script.   On

16   information and belief, Orloff and Emmerich acknowledge that the

17   nature and scope of their project changed entirely with the new

18   additions.   In another interview; from September 26, 2010 by Jami

19   Philbrick for *MovieWeb.com*:

20        a. Orloff: "What happened with 'Anonymous' was I did 'Band of

28

1  Brothers' and worked on other things and then I would take meetings."

2  (Emmerich expresses interest and reads "Soul of the Age").  Orloff

3  continues, "We started meeting about it and talking about it but then he

4  went away to make 'The Day After Tomorrow.' When he came back he

5  called me and said that he had been reading about the Shakespeare

6  authorship issue and he had a few ideas that he wanted to talk about. So

7  we sat down and he told me about some ideas he had to change the

8  script and they were really good ideas. I thought that he was on to

9  something and that started a process of about twenty different passes of

10  a script that is now 'Anonymous.' It's substantially different from 'Soul

11  of the Age' but still similar."

12  35.   Plaintiff asserts that the Defendants' stories illustrate conflicting

13  accounts regarding when Emmerich had first accessed "Soul of the Age"

14  and when he had accessed Plaintiff's Work, "Not Without Justice."

15  Producer Emmerich's next account is a little more telling. The following

16  transcription is from video of Defendant Emmerich speaking on Monday

17  June 6, 2011 at a promotion for "Anonymous," the Shakespeare

18  Authorship Debate, from the English Speaking Union.   Emmerich's

19  opening statement: "Everyone will ask themselves why is Roland

20  Emmerich making a movie about Shakespeare? And this is a really good

1    question because I asked this a lot myself...I was actually looking for

2    scriptwriters to help me with my script that I wrote at that time, 2002,

3    called 'The Day After Tomorrow.' And I got a lot of reading samples and

4    one of them was a script called "Soul of the Age" by John Orloff...and it

5    was pretty much the basis of this film. I was immediately fascinated by

6    the whole story and I was totally virgin. I was totally not aware there

7    was any problems (regarding Shakespeare authorship). So for me it was

8    really quite surprising when I started getting into the subject matter and

9    learned yeah there is a problem.  And then, as you all know, art should

10   not be like all fluff all the time. I think art has to provoke. So I said to

11   myself if I do another kind of movie it has to be something very

12   provoking.  It has to be something that is really heard. And I went on to

13   this umm, on this journey to first of all to help this writer to make this

14   movie better and during this whole time when I was like uhh, working

15   with uh, John on the script I realized all of a sudden how much - little is

16   known about this world of Elizabeth I. I think what we can read in

17   history books is not the true story. In a way that reflected for me also

18   the overall subject of the film. And the more and more I got into it I

19   realized there is a whole other kind of - trove of other um, unknown

20   facts which could be unearthed. And it makes a good story. And that was

1  like for me the most important thing because I'm a storyteller. And

2  when you're a storyteller you know you want to kind of um, really go for

3  it. You want to kind of not hold back. You want to kind of really want to

4  show something which is uh, incredibly eye opening for the audience.

5  And is because of that - also like kind of naturally I hope - very

6  entertaining. So I would say that kind of that Shakespeare didn't write

7  the play is only one of the many scandals this movie will unearth and I

8  can't wait that people see the whole film because there is more to talk

9  about after this movie comes out.  So in general naturally I know there

10  is controversy and I was going for the controversy...(I would like a

11  gentlemanly conversation)...on the subject matter which I then years

12  ago was totally unaware of." On information and belief, here Defendant

13  Emmerich emphasizes the importance of adding the political intrigue to

14  what he predicted would otherwise be judged as a boring "unheard"

15  story. On certain information and belief, Plaintiff alleges that Emmerich

16  and Centropolis Entertainment had already been developing Orloff's

17  "Soul of the Age" when they aggressively, through fraudulent means,

18  sought to peruse Plaintiff's Work (as described later herein), though

19  Emmerich hadn't yet purchased the script from Orloff.  The moment

20  that Emmerich read "Not Without Justice," finding a trove of unknown

31

1    facts which could be unearthed to make for a good story – that was the

2    moment that Emmerich suddenly realized the potential to incorporate

3    "Soul of the Age" into these elements of war and political struggle – the

4    elements that for him was the most important thing because he's a

5    storyteller.   This   speaks   directly   to   the   Substantial   Similarity

6    requirement of Copyright Law, which is a quantitative assessment, not

7    dependent upon the number of instances of exactly copied dialogue or

8    events.   And though "Not Without Justice" and "Anonymous" involve

9    some public domain historical incidents, what is copyright protectable

10   is the very important creative juxtaposition of William Shakespeare

11   (and/or his surrogate Oxford) and his plays into the political snake pit

12   described in Defendants' historical fiction. The editing and rearranging

13   of individual elements, albeit combined with some historical elements,

14   to create new meanings, inferences, relationships, plots and/or subplots

15   of a fictionalized story is creative expression, which in this case

16   contributes to Substantial similarity.

17   36.  On information and belief, Orloff concurs on the importance of the

18   "succession " elements infused into the script. Orloff: "What ended up

19   happening is I wrote a script which was called 'Soul of the Age' about

32

1    12-15 years ago. That's a very different script than the one that was

2    finally shot. 'Soul of the Age' was the script that Roland read and bought,

3    but then he did his own research in the intervening years from when I

4    had written my first draft to when Roland read it, which was five or six

5    years, maybe even eight years. New study had been done about De Vere

6    at Oxford. It's a very new theory and people are discovering stuff every

7    year. Roland posited this idea: 'Well, what if we made the movie about

8    the Elizabethan succession problem? Who was going to be king after

9    Elizabeth? Set the movie in that world,' which the script was not

10   originally about. The original script had none of that and Elizabeth

11   wasn't in the script at all that I originally wrote. If she is, it's one or two

12   short scenes. That then turned into a two or three year odyssey with

13   Roland where I just kept rewriting the script over and over and over,

14   trying to figure out this incredibly complex structure.  By doing that, by

15   making that story that Roland wanted to do, by inserting the politics

16   which, by the way, I loved the idea, because my favorite things are art

17   and politics. This movie now is about the interplay between art and

18   politics. Ultimately that's what the movie's about. It's not about who

19   wrote the plays.  It's about the relationship between art and politics. So I

20   loved that idea but then, how to execute it was really, really tough I

33

1   probably did 20 drafts, literally, just tweaking it and figuring out how

2   many flash forwards, how many flashbacks?"

3   37.   Emmerich concurs that the inherent authorship question is

4   secondary. Emmerich: "It's a mix of a lot of things: it's an historical

5   thriller because it's about who will succeed Queen Elizabeth and the

6   struggle of the people who want to have a hand in it. It's the Tudors on

7   one side and the Cecils on the other, and in between is the Queen.

8   Through that story we tell how the plays written by the Earl of Oxford

9   ended up labeled William Shakespeare."

10   38.   In an interview with *The Atlantic*, Orloff was asked, "In crafting

11   your characters and the narrative, how were you able to find the right

12   balance between historical fact, fiction, and speculation?"  Orloff:

13   "I have done a lot of non-fiction-based movies", he says, "and there is a

14   point where you have to go with the emotional truth, not the literal

15   truth, because the drama is the primary concern."  Orloff relates similar

16   sentiment in his article in the *Wall Street Journal*: "The truth is, there's

17   no truth in film – in any film. Even the films that we think are true, about

18   real people in real places, actually aren't. I also wanted to tell a rocking

19   good story and to express a theme that matters to me a great deal: that

34

1   the pen is mightier than the sword…The film is about showing that ideas

2   are stronger than brute force. Is 'Anonymous' an exact account of the

3   history it covers? No. But the liberties that it takes are necessary for

4   capturing a deeper truth. Just consider the fictionalized characters and

5   imagined events of the "history" plays of Shakespeare himself."

6        a.   Plaintiff asserts that "the liberties that it takes" are creative

7   choices.   Those choices are the creative choices that the Defendants

8   found in the "trove of ideas" in Heusey's Work, "Not Without Justice,"

9   the central theme of which is that the pen is mightier than the sword.

10        b.   Emmerich concurs: "I just hope that the people have an open

11   mind about these things because it gives you a different version of

12   William Shakespeare and a different version of the way that his plays

13   were performed and written. For me, the theme that 'the pen is mightier

14   than the sword' is for me, the most important message of all."

15        c.   Emmerich also notes that Shakespeare himself was not

16   concerned with historical accuracy, and considers that the inner truth

17   was his objective. When asked how much of the movie "Anonymous " is

18   the truth and how much was "Hollywoodized," Emmerich responded,

19   "You can not make a historical film which is accurate or the truth 'cause

1      how are you going to do that?  You have only interpretation. In that way

2      it was my interpretation of the time and my interpretation of what

3      happened. Is it the truth? No never. It can't be..."

4              d.      Orloff speaks to the significance of infusing the political

5      struggle into "Anonymous." Responding to the question of whether or

6      not Roland Emmerich made a lot of contributions to the screenwriting

7      process, Orloff said, "He made huge contributions!...I pitched 'Soul of the

8      Age' to him...and a couple of weeks later he wanted to buy the script. He

9      bought the script from me, he then went off to make another movie

10     ('The Day After Tomorrow'), and came back having done all of his own

11     research on the Shakespeare authorship issue...Basically he wanted to

12     really change the script, but I decided it was in a really good way.

13     Originally the script was just about Ben Johnson, Shakespeare, and the

14     Earl of Oxford. There was no Elizabeth, almost no politics, no love affair,

15     no children, none of that. He read a theory that we now have in the

16     movie. He thought the movie should be more about who's going to be

17     the next king, the succession issue rather than just this story about

18     censorship and art..."

1      e.  Orloff: "So we sat down and he told me about some ideas he

2   had to change the script and they were really good ideas. I thought that

3   he was on to something and that started a process of about twenty

4   different passes of a script that is now 'Anonymous.'" It's substantially

5   different from 'Soul Of The Age' but still similar."

6   30.   The Plaintiff claims that "Anonymous" is different from "Not

7   Without Justice," but embodies substantially and qualitatively similar

8   elements that take the heart out of Heusey's Work, "Not Without

9   Justice."

10   **A PARTIAL LIST OF SIMILARITIES**

11   39.   ANON: "Anonymous" – the Defendants' title and premise.

12      NWJ:

13           ELIZABETH

14      Well - Christopher Marlowe is alive, living in Denmark,

15      wanting to use "William Shakespeare" as his pseudonym to

16      maintain anonymity because some government agent would

17      have - imagine Christopher Marlowe using "William

18      Shakespeare" as a front!

19   Granting that anyone can lift a concept from anyone's work, the Plaintiff

20   asserts that, having done four years of research, little in "Not Without

37

1    Justice" flowed naturally from any premise therein. The

2    characterizations, the relationships between characters, and the cause

3    and effect nature of their interactions – all combing to build plot and

4    story - was the result of a long and patient, often frustrating, process for

5    the Plaintiff.

6    40.   A substantial similarity, central and constant to both works, is the

7    ability of theatre to reach people, or stated differently, wielding a pen as

8    a sword to fight battles.  The writer and director Defendants point to the

9    importance of this theme in their interviews.  The producer and

10    distribution Defendants of "Anonymous" point to its importance by

11    using it in the marketing of their film.  In the video trailer often utilized

12    to promote their film, while the audience sees a montage of fighting and

13    battles, the voiceover (presumed to be Shakespeare) implores, "Why

14    can't I change the world with words?"   Other examples from the

15    screenplays:

16        a. NWJ:

17                            WILL

18                And yet I could fight with 1000 words and

19                    lose no men...

20        b. NWJ:

1           WILL

2       My pen is my sword. And, my lord, as your sword

3       is your sword - most sharp – my word is my word. My

4       words - sharp or dull, as I choose - choose to serve the

5       people of England.

6    c. ANON:

7           ESSEX

8       And when did words ever win a kingdom? I think I'll

9       Keep my sword, thank you very much.

10    d. NWJ:  Shakespeare speaks with the Queen:

11           WILL

12       I wish my pen to serve England's honor.

13    e. NWJ:  Shakespeare to Essex:

14           WILL

15       Words are my conquering sword. I wish my pen to serve

16       honor.

17  41.  Also a substantial similarity, central and constant to both works,

18  is Essex's determination to become King of England and his interaction

19  with Shakespeare/Oxford. Examples include, but are not limited to:

20    a. NWJ:

1

ESSEX

2       No, I will ascend to England's throne, but with the

3       love of the Queen and the love of her people.

4    ANON:

5               OXFORD (talking with Essex)

6       No. If this is to be done, it must be done carefully,

7       skillfully.

8  b. NWJ:

9               ESSEX (inciting his army to civil war)

10      YOU are England's army...you and the people

11      must decide who is next King.

12   ANON:

13               OXFORD

14      I desire nothing more than to see the next king be

15      the rightful king. But what Essex contemplates will

16      surely lead to Civil War.

17  42.   Both works include many instances of the very creative notion,

18  certainly not historically founded, that Shakespeare/Oxford was writing

19  letters to the Queen on behalf of Essex.  Plaintiff Heusey imagined this

20  possibility.

40

43. In both works, the Essex rebellion is depicted as part of the climax, selecting many of the day's same moments, and there were many important possibilities to select from.

44. Also substantially similar, central and constant to both works, is the Queen's refusal to name an heir, and subsequently the Cecils' desire for power and influence. They fight for the power to choose the next king. Plaintiff grants that this is an historical element, but points to the similarity to illustrate the overall fabric of the stories.

45. There are many other individually less substantial similarities that together create the overall mood and effect shared by both projects. Here are a few examples. (These similarities also illustrate the impossibility that the Defendants independently created their script.)

a. Early in both works, a Constable and his men break in doors, violently searching...leading to the torching of a theatre/ship...

b. Soon thereafter in both works, London's theatre is introduced by characters walking through its many galleries.

c. Soon thereafter in both works, Shakespeare/Oxford is seen standing behind a curtain, observing. This element is not an historical account.

d. Soon thereafter in both works, the closing of the theatre

1    because of the playing of a slanderous/seditious play.

2         e.   Both works feature an imagined encounter: after a violent

3    search a constable arrests a writer...they imprison the writer in the

4    Tower...and finally torture and question the shackled writer's while:

5              1) NWJ:  Cecil emerges from the darkness, approaching Will.

6              ANON: there is someone else there, a FIGURE, watching,

7                        but cloaked in the darkness.

8         2) NWJ: the writer spits blood.

9              ANON: the writer spits out a tooth.

10        f.   "Not   Without   Justice"   and   "Anonymous"   both   depict

11   Shakespeare killing of Marlowe.   This element is not an historical

12   account.   As noted earlier, the Plaintiff could not find any explicit

13   evidence of this theory prior to his research exploring the possibility.

14   Shakespeare's killing of Marlowe was used in "Anonymous," though

15   Defendant Orloff admits that Marlowe's death isn't relevant to their

16   story.  Yet the Plaintiff's Work becomes more and more redundant – and

17   thus not marketable - with the inclusion of these details. Orloff discusses

18   the choice he faced: "Do we have Marlowe in the movie at all?  Well,

19   there's drafts where there is no Marlowe. He's actually dead when most

20   of the things that happen in the movie happen. We sort of push his death

1    back a little bit but then his absence was felt. Here's this great world and

2    the other great playwright of the time isn't in the movie, so we brought

3    Marlowe back in. Okay, what de we do about Marlowe's death? How do

4    we make him part of the movie? Well, we had versions where

5    Shakespeare killed Marlowe and we had versions where Shakespeare

6    didn't kill Marlowe. The one where Shakespeare kills Marlowe, or at

7    least it's hinted that Shakespeare killed Marlowe seemed to be the best,

8    so that's why it's in the movie. Some people might get very upset at that

9    choice which is clearly a dramatic choice. I don't really believe that

10   William Shakespeare killed Christopher Marlowe. I think his death is

11   pretty well established."

12          g.  In both works Essex attends the play a "Midsummer Night's

13   Dream" with his Queen. In "Not Without Justice," Shakespeare watches

14   from behind the curtain. In "Anonymous," Oxford watches from behind

15   the curtain.

16          h. Also in both works:

17              1) NWJ:

18                          WILL

19              ...I give a damn that 800 groundlings four times a

20              week will pay a pence to see my plays and I will be

43

1  paid – I will earn 1 pence for every 10 paid.

2  2)  ANON:

3           OXFORD (Shakespeare surrogate)

4  Henry, how many people were at that

5  play?

6           SOUTHAMPTON

7  Hmm? I'm not sure, two thousand, maybe more.

8           OXFORD

9  And how many performances are there of a play

10  like that?

11          SOUTHAMPTON

12  Five or six I suppose.

13          OXFORD

14  Ten thousand souls. All listening to the writings

15  of one man - the ideas of one man. That's power,

16  Robert. And if there is one thing the Cecils understand,

17  it's power.

18  Furthermore this is another example of the creative juxtaposition

19  discovered in the Work: the power of Shakespeare/Oxford's pen to

20  influence Elizabethan politics, the heart of "Not Without Justice."

44

1       i.   Both works employ Shakespeare's family motto "Non Sans

2   Droit." Beyond being the Plaintiff's Work's title, within the body of both

3   screenplays the Plaintiff and the Defendants explain the motto's

4   meaning and its significance in a similar manner, though in a different

5   context. Furthermore this is another instance of the Defendants

6   including an element that is not relevant to their story, serving no

7   purpose but to render Plaintiff's Work redundant, and therefore not

8   marketable.

9       j.   In "Not Without Justice," Shakespeare's father accuses

10  Shakespeare of "whoring around in London." On information and belief,

11  Defendant Holtorf had handwritten three exclamation marks next to

12  this dialogue in the script handed back to Plaintiff by Holtorf. Certainly

13  somebody fluent in German at Centropolis Entertainment judged the

14  possibility to be entertaining. In the Defendants' film Shakespeare is

15  seen enjoying a whore or two.   This element is not based on any

16  historically documented account.

17      k.  In both works Shakespeare/Oxford expresses the importance

18  of a "good reputation."

19      l.    1) NWJ: Marlowe pawns off unwanted assignment to

20  Shakespeare:   William Cecil commissions him to write poems

45

1  encouraging Southampton to marry.

2          2) ANON:  Ben pawns off unwanted assignment to Will.

3      m.   Both works employ the threat of Spain taking advantage of
4  divided country.

5      n.  In both works, when Will/Oxford refuses to cooperate, Robert
6  Cecil cunningly suggests his dire option:   death. This element is not
7  based on any historical account.

8      o.  In both works, Will/Oxford's wife Anne berates him for writing.
9  This element is not based on any historical account.

10      p.  In both works the Cecil's contemplate arresting Shakespeare.
11  This element is not based on any historical account.

12      q.  In both works Shakespeare kills Marlowe, specifically to
13  prevent Marlowe from revealing a compromising truth.  This element is
14  not based on any historical account.

15          1) NWJ:  Confronting Will, Marlowe knows that he's getting
16  very close to a compromising truth.

17          2)  ANON:   Jonson looks up. Marlowe smiles, knowing he is
18  closer to the truth.

19      r.  Both works use of play Richard II/Richard III to inspire mob,
20  one example of a superficial alteration that fails to efface infringement.

46

s.  Both works use poem "Venus and Adonis" to seduce Elizabeth.

t.      1)  NWJ:

WILL

My lies will live - yet even when all the

Breathers of this world are dead.

2) ANON:

PROLOGUE

(our poets story) shall be remembered... as

long as words are made of breath and

breath of life.

u.  Both works employ the incident whereas Burghley has found a note indicating that King James contemplates killing the Queen before her natural death.   Heusey discovered the basis for this in a primary source, then imagined the specifics of the matter.

v.  Shakespeare/Oxford is offered by Cecil/Burghley to excused of murder, suggesting self-defense as an alibi that would be accepted, if he cooperates with Burghley's purposes.

46.   As Defendants Orloff and Emmerich point out, even when basing a work on historical characters, a writer is still creating those characters, regardless of their names.  As Shakespeare famously said,

1  "What is in a name?"

2  47. Furthermore, Heusey had been scorned for writing flashbacks

3  within flashbacks. "It can't be done." "This is evidence that you're a

4  novice." Such was the advice Heusey was given. However, Emmerich

5  liked the style and pushed Orloff, as the writer describes, through

6  multiple rewrites, trying to fit this new story of political intrigue into

7  this new structure.

8  48. Furthermore, speaking to the impressions of ordinary observers,

9  as already mentioned London resident Tasha Brown brought

10  "Anonymous" to Plaintiff's attention, after having recognized in their

11  promotional trailer what seemed to her to be Plaintiff's Work, other

12  people who were familiar with Plaintiff's screenplay, "Not Without

13  Justice" also contacted Plaintiff after having seen the promotional trailer

14  – all after not discussing the project for years.

15  49. Considering the substantially similar parallel characters,

16  structure, subplots, and the substantially similar interactions between

17  the parallel characters found in "Anonymous," allegedly created and

18  written by Defendants Orloff and Emmerich, and "Not Without Justice,"

19  created and written by Plaintiff Heusey - and the direct access

20  Defendants had to view Plaintiff's Work - it is apparent there is no

1   possibility the similarities are the product of mere coincidence.

2   **CLAIM I**

3   **(Direct Copyright Infringement, 17 U.S.C. §§ 101 et seq.)**

4   50.   Plaintiff repeats and alleges every allegation in paragraphs 1

5   through 49 as if set forth herein in length.

6   51.   Plaintiff owns copyright interests in Plaintiff's Work as evidenced

7   by his copyright registration and application. (Please see Appendix A).

8   52.   Plaintiff maintains the exclusive right to prepare derivative works

9   based upon the copyrighted Work, pursuant to 17 U.S.C. § 106.

10   53.   Pursuant to 17 U.S.C. § 501, anyone who violates any of the

11   exclusive rights of the copyright owner is an infringer of the copyright

12   or right of the author.

13   54.   At no point in time did Plaintiff authorize any Defendant to exploit

14   "Not Without Justice" in any manner whatsoever.

15   55.   Defendant Orloff is improperly credited as the sole writer of

16   "Anonymous," as the Defendants have chosen to not recognize the

17   admittedly substantial contributions of Plaintiff to their story. Plaintiff

18   also maintains the right to be credited for his contributions to the

19   Defendants' work.

56. On information and belief, Plaintiff asserts willful and contributory infringement by Defendants' Emmerich, Centropolis Entertainment, Anonymous Pictures, James, Holtorf, and Orloff, accomplished through their willful acts of copying, use, modification, reproduction, display and distribution of elements found in Plaintiff's Work and then embodied in the film "Anonymous," including without limitation, elements that embody expression of ideas and concept, themes, subplots, and characterization contained therein and all derivatives thereof. These actions herein described constitute a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(2), and all Defendants were acting as infringers within the meaning of Title 17 U.S.C. §§ 501(a).

57. On information and belief, Defendants continue to exploit said elements through DVD and Internet sales, and other licensing arrangements. Each new infringement by Defendants constitutes a separate and distinct act of infringement.

58. Defendants acts of infringements were willful and in disregard of and with indifference to the rights of Plaintiff.

59. On information and belief, all Defendants received a direct financial and economic benefit from the infringement of Plaintiff's

1  copyright in his Work, "Not Without Justice."

2  60.  As a proximate result of Defendants' copyright infringement,

3  Plaintiff has suffered and will continue to suffer substantial, immediate,

4  and irreparable injury, which he prays can be remedied to some degree

5  by monetary damages.

6  61.  As a result of Defendants' actions, Plaintiff has been damaged in

7  an amount to be determined at a trial of this action, which, upon

8  information and belief, exceeds, the sum of $1.4 million.

9  **CLAIM II**

10  **(Contributory Copyright Infringement)**

11  62.  Plaintiff incorporates by reference each and every allegation

12  embodied in paragraphs 1 through 61, inclusive, as if fully set forth

13  herein.

14  63.  On information and belief, Plaintiff asserts that Defendants

15  Emmerich, Centropolis Entertainment, and Anonymous Pictures have

16  initially and continually contributorily infringed on the Plaintiff's

17  copyrighted Work by inducing and encouraging direct infringement by

18  other Defendants as has been set forth in detail throughout this

19  complaint, though not exhaustively. Plaintiff prays that he will have the

20  opportunity through the process of discovery and through trial to reveal

51

1    other details that he is confident will describe the truthful timeline and

2    circumstances of the development of "Soul of the Age" into the

3    screenplay and subsequent film "Anonymous."

4    64.    Through their conduct herein alleged, said Defendants willfully,

5    knowingly and systemically induced, caused, materially contributed to

6    and participated in the misappropriation and infringement of Plaintiff's

7    Work, "Not Without Justice," for purposes of commercial advantage or

8    private financial gain.

9                             **CLAIM III**

10                  **(Vicarious Copyright Infringement)**

11   65.    Plaintiff incorporates by reference each and every allegation

12   embodied in paragraphs 1 through 64, inclusive, as if fully set forth

13   herein.

14   66.    On information and belief, Defendants Relativity Media, Sony

15   Pictures Entertainment, Columbia Pictures, and Studio Babelsberg

16   Motion   Pictures   distributed   or   arranged   the   distribution   of

17   "Anonymous" through motion picture exhibitors throughout the world,

18   cable   companies,   DVD,   online   distribution,   and   potentially   other

19   licensing arrangements. Such exploitations constitute infringements of

20   Plaintiff's copyright in his Work, including his exclusive rights of

52

1    reproduction, distribution, and public performance, pursuant to 17

2    U.S.C. §§ 106 and 501.

3    67.  On information and belief, Defendants Relativity Media, Sony

4    Pictures Entertainment, Columbia Pictures, and Studio Babelsberg

5    Motion Pictures, all have an obligation to perform a diligent, complete

6    and thorough title search, evidencing the chain of title and actual

7    genesis of any project, as well as the right and ability to supervise and

8    control the infringing conduct of their exhibitors, their cable, online and

9    DVD companies and other persons or entities exploiting the film.

10   Defendants have not exercised such diligence or supervision to the

11   extent demanded by the law. As a direct and proximate result of such

12   refusal, Defendants have negligently contributed to the infringed

13   Plaintiff's copyrights in Plaintiff's Work.

14   68.  Defendants only once sought, *after* fraudulently acquiring the

15   Work, but never obtained Plaintiff's permission to copy, duplicate,

16   perform, exploit, or otherwise use Plaintiff's copyrighted Work.

17   69. Defendants  derive  a  direct  financial  benefit  from  this

18   infringement, including but not limited to, improved reputations,

19   increased sales and increased value of Defendants' film libraries and/or

20   businesses, arising from the use of Plaintiff's Work.

53

70.   Each such infringement for which Defendants are vicariously liable constitutes a separate and distinct act of infringement.

71.   As a direct and proximate result of the infringements by Defendants, Plaintiff is entitled to damages and to a percentage of Defendants' revenue in amounts to be determined at trial, as they are not currently ascertainable. Alternatively, Plaintiff is entitled to maximum statutory damages of $150,000, or in such other amount as may be proper under 17 U.S.C. § 504(c).

72.   Plaintiff is further entitled to reimbursement of attorneys' fees, if any, and allowable costs, pursuant to 17 U.S.C. § 505.

73.   As a result of Defendants' acts and conduct, Plaintiff sustained and will continue to sustain substantial, ongoing injury for which there is no adequate remedy at law. Though customary to restrain further exploitation of an infringing work, Plaintiff asserts that if an agreeable remedy is granted, Defendants may continue to exploit the film "Anonymous." If no agreeable remedy is determined, Plaintiff will maintain this right and pray for the preliminary and permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

# CLAIM IV

## (Fraud)

74. Plaintiff incorporates by reference each and every allegation, specifically the damages to Heusey resulting from Defendants' actions or lack of actions, embodied in paragraphs 1 through 73, inclusive, as if fully set forth herein.

75. On information and belief, Defendant James knowingly and intentionally deceived Plaintiff by stating that he intended to create a visual effects breakdown and budget, persuading Plaintiff to share his Work with James, who was adamantly committed to giving the script to Defendant Holtorf, a representative of Defendants Emmerich and Centropolis Entertainment.

76. On information and belief, Defendant James knew that Defendants Emmerich and Centropolis Entertainment were developing for production Defendant Orloff's script, "Soul of the Age," but concealed this information from Heusey.

77. Relying upon Defendant James false pretense, as evidenced by the Confidentiality Agreement signed by James, Plaintiff did entrust him with a printed version of "Not Without Justice."

78. Subsequently Defendant James, against Heusey's express demands to the contrary, presented the script to Defendant Holtorf, knowing that the act could never truly be undone. Plaintiff points to the Arrow information paradox named after Kenneth Arrow, American economist and joint winner of the Nobel Memorial Prize in Economics. The Arrow information paradox describes a problem that companies face when managing intellectual property across their boundaries. A fundamental tenet of the paradox is that a potential purchaser of intellectual property wants to know the contents of the intellectual property in sufficient detail as to understand its potential so as to decide whether or not to buy it. Once the customer has this detailed knowledge, however, the seller has in effect transferred the intellectual property to the customer without any compensation.

Though typically applied in legitimate transactional affairs, this paradox is easily applied to theft of intellectual property. Though Defendant Holtorf, acting on behalf of Emmerich and Centropolis Entertainment, returned the hard copy of the script to Plaintiff, in effect the Defendants had acquired the Work embodied in the script. Furthermore a likelihood exists, given the level of detail in the

1   similarities, that the Defendants had physically copied the script prior to

2   returning the original pilfered hard copy to Plaintiff. Physical copying is

3   also inferred from stressed state of the brass brads binding the printed

4   screenplay.

5         Defendant James asked for an updated script once, seemingly to

6   accomplish his proposed purposes, however, ignoring requests by

7   Heusey, James never did generate or present a breakdown or budget to

8   facilitate the planning of the visual effects intended for the production of

9   "Not Without Justice."

10                            **CLAIM V**

11                           **(Conversion)**

12   79.  Plaintiff repeats and alleges every allegation in paragraphs 1

13   through 78 as if set forth herein in length.

14   80.  Plaintiff reasserts owned and had a right to possess and control

15   the copyrighted Work, "Not Without Justice."

16   81.  The taking of the Work was both direct and indirect; that is, on

17   information and belief, at the direction of Defendant Emmerich and the

57

1   actions of his various agents, the other Defendants.   As regards

2   Defendants Emmerich, Centropolis Entertainment, Anonymous Pictures,

3   James, Holtorf, and Orloff,  their actions to secure unfair and unlawful

4   gain were intentional and fraudulent.

5   82.   Plaintiff claims loss of the immediate income from not having

6   received any monetary compensation from the Defendants for the use of

7   his Work.

8   83.   The marketing and distribution of "Anonymous" and its ill success

9   in the market have all combined to substantially interfere with Heusey's

10   ability to market his Work. As this damage is difficult to calculate, but

11   considering the willful nature of the conversion, Heusey seeks at a

12   minimum, statutory damages of $150,000.

13   84.   Addressing U.S. 1332, the sum of the losses attributable to the lack

14   of credit given to Heusey for his Work is difficult to calculate but

15   certainly greater than $75,000.  Taking credit for someone else's works

16   is a matter of theft.  Plaintiff seeks damages of $1.4 million.

17   **CLAIM VI**

18   **(Unfair Competition)**

58

1  85.  Plaintiff repeats and alleges every allegation in paragraphs 1

2  through 84 as if set forth herein in length.

3  86.  Defendants' conduct described and alleged herein was for the

4  purpose of injuring Plaintiff in his business, and has injured in Plaintiff

5  in his business.

6  87.  Defendants use of substantial elements that had no relevance to

7  their story show a willful attempt to replace Heusey's Work in any

8  potential market.   Wrapping up a conversation with veteran

9  entertainment attorney, Plaintiff suggested that he would be happy to

10  let this infringement pass, if the producers of "Anonymous" would work

11  with Plaintiff on the "sequel," using the elements from "Not Without

12  Justice" that were not fully developed in "Anonymous."   Without

13  hesitation the attorney replied that they wouldn't do that – because

14  "Anonymous" had proven the subject to be not profitable. Plaintiff

15  asserts that this may not be literally true, but it is affectively true.

16  88.  Using Plaintiff's Work, which he reasonably protected, as

17  embodied in the Defendants' film "Anonymous," has severally benefited

18  the Defendants. Plaintiff has been damaged in an amount to be

19  determined at trial including, but not limited to, the value of Plaintiff's

1   ideas and loss of a share of the fees and income shared by the various

2   Defendants.

### CLAIM VII

### (Unjust Enrichment)

5   89.  Plaintiff repeats and alleges every allegation in paragraphs 1

6   through 88 as if set forth herein in length.

7   90.  Defendants have severally received substantial gains, advantages,

8   and benefits directly and indirectly by appropriating Plaintiff's Work

9   and passing off several substantial and attractive elements as their

10  original work.

11  91.  As evidence by interviews with Defendants Orloff and Emmerich,

12  the development of "Soul of the Age" would not have continued without

13  the  infusion of the substantial elements taken from the trove found in

14  Heusey's "Not Without Justice." Orloff's "Soul of the Age" would not have

15  become "Anonymous," with its inherent theme of the pen being mightier

16  than the sword, and all the elements supporting this theme – many of

17  which were stolen from "Not Without Justice." "Anonymous" would not

18  have been produced.  Therefore any and all fees and income "earned" by

19  the Defendants from development, production, and distribution are

20  attributable to "Not Without Justice."