Kenneth R. Heusey, *pro se*
109 Smithfield Street
Pittsburgh, PA 15222
T: (310) 963-6772
E: kenheusey@gmail.com



# United States District Court
## For the
## Central District of California

KENNETH HEUSEY, Plaintiff

- against -

ROLAND EMMERICH;
    CENTROPOLIS ENTERTAINMENT, INC.;
ANONYMOUS PICTURES LIMITED;
JOHN ORLOFF;
PETER NORTHBOURNE JAMES;
PETRA HOLTORF-STRATTON;
RELATIVITY MEDIA FILMS, LLC;
SONY PICTURES ENTERTAINMENT, INC.;
    Parent company of COLUMBIA PICTURES INDUSTRIES, INC.,
    *Defendants*

2:14-cv-6810-001-AB-E

Copyright
Infringement
AMENDED
COMPLAINT


**DEMAND FOR JURY TRIAL**


ORIGINAL


# PLAINTIFF'S AMENDED COMPLAINT
# COPYRIGHT INFRINGEMENT & OTHER CLAIMS

1

# TABLE OF CONTENTS

1) JURISDICTION AND VENUE                                   p. 3

2) NATURE OF THIS SUIT                                      p. 4

3) THE PARTIES                                              p. 5

4) THE FACTS                                                p. 8

5) ACCESSS TO PLAINTIFF'S WORK                              p. 9

6) DEFENDANTS' ALLEGED CREATION OF "ANONYMOUS"              p. 14

7) COPYRIGHT LAW                                            p. 16

8) PROBATIVE SIMILARITIES                                   p. 18

9) SUBSTANTIAL SIMILARITIES                                 p. 20

10)  FAIR USE                                               p.32

11)  RIGHT OF FIRST PUBLICATION                             p. 33

12)  CLAIMS                                                 p. 36

13)  REQUEST FOR RELIEF                                     p. 50

14)  SPOLIATION NOTICE                                      p. 53

15)  DEMAND FOR JURY TRIAL                                  p. 54

16)  VERIFICATIONS                                          p. 55

17)  CERTIFICATE OF SERVICE                                 p. 56

1    **JURISDICTION AND VENUE**

2    1. This action arises under the Copyright Act of 1976 (hereinafter "the

3    Copyright Act"), 17 U.S.C. §§ 101 et seq.

4    2. This action is brought, and subject matter jurisdiction lies within

5    this Court, pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6    3. This Court has federal question jurisdiction in this matter in that

7    Plaintiff seeks damages against the Defendants named herein under §§

8    501 through 505 of the Copyright Act, 17 U.S.C. §101 et seq. The Court

9    has pendant jurisdiction over any claims asserted herein which arise

10   under state law in that such claims flow from a common nucleus of

11   operative fact.

12   4. Venue lies within this Court pursuant to 28 U.S.C. Sections 1391

13   (b)(1) − (3), 1391(c), 1391(d), and 1400(a) in that the majority of

14   Defendants reside for venue purposes and are subject to personal

15   jurisdiction in this District, and that a substantial part of the events or

16   omissions giving rise to Plaintiff's claims occurred in the Central District

17   of California. In particular, on information and belief, the majority of the

18   individual Defendants reside in the United States, though one, on

19   information and belief (Roland Emmerich) is a German national.

20   Therefore all can be sued in any district, including this District.

1   Plaintiff Kenneth Heusey brings this suit against Defendants,

2   alleging the following:

3                        **NATURE OF THIS SUIT**

4   5. This is an action for copyright infringement under the legal causes

5   of action of Direct Copyright Infringement, Contributory Copyright

6   Infringement, Vicarious Copyright Infringement, and related complaints,

7   including Fraud, arising out of the Defendants willful and deliberate

8   copying, and exploitation of elements of the original screenplay, *Not*

9   *Without Justice*, (the Work) developed and written by Plaintiff, and used,

10  without express or implied permission, in the acclaimed motion picture

11  *Anonymous* and in the Defendants' various online promotional trailers

12  and commercial spots without any work credited to Plaintiff and with

13  no compensation of any kind to Plaintiff. Defendants had been in the

14  film business for many years, thus after aggressively and fraudulently

15  obtaining access to the Work, *knowingly* violated Plaintiff's rights.

16  Defendants profited severally from their infringing activities by the

17  income and licensing fees received for their various contributions to the

18  development, production, and distribution of the infringing works.

19

20

4

1     **THE PARTIES**

2     6.    Plaintiff Kenneth Heusey (Heusey) is a citizen of the United States,

3     residing in Pittsburgh, PA and is a screenwriter and successful visual

4     artist. Starting the Work sometime in late 1995, continuing with over

5     four years of research and development while living and working in Los

6     Angeles, the Plaintiff completed the Work in April 2000. He intended the

7     Work to be his entrée into the Hollywood "Above the Line" community.

8     The script focused on the alleged murder of Christopher Marlowe by

9     William Shakespeare, and William Shakespeare's strategic use of his pen

10    and words to achieve his personal goals and to influence the politics

11    surrounding the succession to the dying, heirless Queen Elizabeth I.

12    7.    Defendant Roland Emmerich (Emmerich), on information and

13    belief, is a German national residing in Los Angeles, CA. On information

14    and belief, he is a successful film director, screenwriter, and producer,

15    known for his action films, and represented by Creative Artist Agency.

16    On information and belief, Emmerich is and was at all times material to

17    this action as he developed, co-produced, and directed *Anonymous*.

18    8.    Defendant    Centropolis    Entertainment    (Centropolis),    on

19    information    and    belief,    is    a    privately    held    company    founded    by

20    Defendant Emmerich with its principal place of business in Los Angeles,

1  CA. On information and belief, Centropolis is and was at all times

2  material to this action as one of the production companies developing

3  and producing the infringing work.

4  9.  Defendant Sony Pictures Entertainment, Inc. (Sony Pictures) is the

5  American entertainment subsidiary of the Japanese multinational media

6  and technology conglomerate Sony Corporation, operating out of Culver

7  City, CA. It includes Sony's motion picture, television production, and

8  distribution units. On information and belief, at the time of the

9  instigating action Defendant Centropolis operated at the Sony Pictures

10  studio lot. Through its subsidiary Columbia Pictures, Sony Pictures was

11  a producer and is a distributor of the infringing work.

12  10.  Defendant Columbia Pictures, Inc. (Columbia Pictures) is an

13  American film production and distribution studio, a division of the

14  Columbia TriStar Motion Picture Group, a division of Sony Pictures

15  Entertainment, a subsidiary of the Japanese conglomerate Sony, with its

16  principal place of business in Culver City, CA. On information and belief,

17  Columbia Pictures was a producer and has been a distributor of the

18  infringing work.

19  11.  Defendant Anonymous Pictures, on information and belief, is a

20  privately held company with its principal place of business in London,

6

1  England. On information and belief, Defendant Anonymous Pictures has

2  been at all times material to this action as one of the production

3  companies producing the infringing work.

4  12.  Defendant Relativity Media Films, LLC (Relativity) on information

5  and belief, is a limited liability company with its principal place of

6  business in Beverly Hills, CA.  On information and belief, Defendant

7  Relativity was involved in the financing and distribution of *Anonymous*.

8  13.  Defendant John Orloff (Orloff), on information and belief, is a

9  United States citizen, residing in Ghent, NY.  On information and belief,

10  Orloff is a screenwriter represented by the Creative Artist Agency. Orloff

11  wrote the screenplay for *Anonymous,* working closely with Defendant

12  Emmerich on its development. On information and belief, Defendant

13  Orloff is and was at all times material to this action.

14  14.  Defendant Peter Northbourne James (James) on information and

15  belief, is a United States citizen, residing in Marina del Rey, CA. On

16  information and belief, James was an independently-contracted visual

17  effects supervisor, working with Centropolis. On information and belief,

18  Defendant James is and was at all times material to this action.

19  15.  Defendant Petra Holtorf-Stratton (Holtorf) on information and

20  belief, was a German national at the time of the instigating actions, now

7

1   married and a resident of Los Angeles, CA. On information and belief,

2   Holtorf was a visual effects supervisor, now also a producer. On

3   information and belief, Holtorf was working with Defendant Emmerich,

4   assisting on the development of *Anonymous*. On information and belief,

5   Defendant Holtorf is and was at all times material to this action.

6   16. The Plaintiff, filing this complaint pro se, in reliance on the

7   integrity of our justice process and its truth seeking mission, prays that

8   the Court will consider this complaint on its merits. Plaintiff intends to

9   engage an attorney at the earliest possible moment.

10                **THE FACTS:** INTRODUCTION

11   17. After four years of research and writing, Plaintiff completed the

12   first presentable draft of *Not Without Justice* (the Work) in April 2000,

13   then applied for copyright registration, making the required deposit.

14   Copyright was granted without qualification or exception. Plaintiff owns

15   and administers the copyright in his Work. (Appendix A, Exhibit 1, 2)

16   18. Prior to registration in the United States, Plaintiff's Work was

17   known by a select few. While continuing to refine the screenplay,

18   Heusey simultaneously developed two possibilities: *producing the film*

19   or *selling the rights* to his unique Work. During this development

20   process, Heusey trusted that his Work was valuable, but was concerned

1  that it was vulnerable (as you cannot copyright concepts), so he was

2  cautious in his dealings, requiring even friends to sign a confidentiality

3  agreement before presenting *Not Without Justice* for consideration.

4  19.  On September 2, 2011 Tasha Brown, who was to have been

5  Heusey's liaison in London, but who hadn't been in communication for

6  many years, contacted Heusey via Facebook, presuming that a film being

7  promoted in London, *Anonymous*, was the culmination of Heusey's

8  efforts. Plaintiff, who was now residing in Pittsburgh, PA, developing

9  other projects, was able to find video previews of *Anonymous* online.

10  Defendant's *Anonymous* previews emphasize the theme of the "pen

11  being mightier than the sword" and the story of William Shakespeare's

12  entanglement  in  vicious  Elizabethan  politics  –  both  elements

13  substantially similar to Plaintiff's Work. As will be detailed later, the

14  writers and producers of *Anonymous* did not copy *Not Without Justice*

15  exactly, however they used substantially similar creative elements of

16  Shakespeare's involvement in - and the influence of his pen, his plays,

17  and his words - over the politics of the day.

18                    **THE FACTS:** ACCESS TO PLAINTIFF'S WORK

19  20.  Plaintiff alleges that the Defendants had various channels of

20  authorized and unauthorized direct access to Plaintiff's Work, all

1    with Creative Artist Agency as the nexus. Creative Artists Agency (CAA),

2    a leading entertainment agency with offices worldwide, represents the

3    most successful actors, actresses, writers, directors, and other

4    influential artists. Its agents are often deeply involved in the packaging,

5    financing, and sale of films. "Packaging" is the process of attaching the

6    creative team - including writers, directors, producers and actors - to a

7    film project, building an attractive investment to present to distributors

8    and financiers.  In and around the year 2000, the time of the initial

9    infringing activities,  CAA represented Roland Emmerich, John Orloff,

10   and other filmmakers that may later prove to play a part in this action,

11   but for now the facts only support the following access.

12   21.    Proving access (and supporting a claim of Fraud): in May 2000,

13   while on a photo shoot, Heusey met Defendant James, who after

14   discussing the project, represented to Heusey that he would analyze the

15   Work, listing potential visual effects shots, and subsequently generating

16   a proposed budget to produce the shots. On reliance on an NDA signed

17   by James (Appendix B, Exhibit #4), Heusey shared the Work with him.

18   After reading the script, James suggested to Heusey that Centropolis

19   would be interested in reading *Not Without Justice.* Plaintiff welcomed

20   the possibility, but insisted that a representative of Centropolis would

1  need to sign an NDA before he would submit the screenplay for the

2  company's consideration. James persisted, advising that that wasn't

3  how it was done and that Heusey should take advantage of this

4  opportunity, further stating that he knew the people at Centropolis well

5  and they would not take advantage of him in any way.  Heusey was

6  tempted by the opportunity, but insisted that any third party would

7  need to sign an NDA. Furthermore, Heusey continued to press for the

8  promised visual effects breakdown; on August 31, 2000 Defendant

9  James asked for an updated script.  Shortly afterwards James informed

10  Heusey that he had forwarded the Work to Defendant Holtorf of

11  Centropolis Entertainment, without having her sign an NDA.  After

12  expressing his frustration to James, and after a couple of weeks of

13  deliberation, considering that Centropolis already had access to

14  his Work, and thus the benefit of its intellectual property, Plaintiff

15  decided to meet to possibly negotiate a fee for the sale of the Work

16  and/or discuss a co-production.

17  The meeting was at the Centropolis office on the Sony Pictures studio lot

18  on October 10, 2000.  There Defendant Holtorf, on behalf of Defendant

19  Centropolis Entertainment, made an offer of $15,000 and no promise of

20  credit or involvement. Holtorf would not negotiate.  At the end of the

11

1    meeting, Defendant Holtorf returned the purloined copy of the Work to

2    Heusey, which now featured hand-written notes on every page.  Most of

3    these notes are simple translations from English to German, but a few

4    are subjective appraisals of the content. (Defendants Holtorf and

5    Emmerich were at the time German nationals.) This demonstrates that

6    the script was read line for line, word for word, through its entirety.

7    Also, the brass brads were bent, indicating that the bound script had

8    been taken apart to facilitate copying. Defendant James never submitted

9    an analysis or budget to Heusey. Heusey never again spoke with James,

10   Holtorf, or any Defendants. Plaintiff continued taking many other

11   meetings regarding *Not Without Justice* well into 2002, but interest in

12   the project ground to halt, so he shelved the Work to develop other

13   projects. Heusey does possess the printed, annotated (in German)

14   script, as proof of access.

15   **THE FACTS:** DEFENDANTS' ALLEGED CREATION OF "ANONYMOUS"

16   22.   Plaintiff does not dispute that Defendant Orloff wrote *Soul of the*

17   *Age*, completing it in 1998 and then pitching it to various production

18   companies. On information and belief, Defendant Orloff researched and

19   developed a story focused only on the Shakespeare authorship question.

12

23. On information and belief, Defendant Emmerich became familiar
with Orloff's script *Soul of the Age*, subsequently purchasing the
screenplay from him in 2001, 2002, or 2003; the timing of his
awareness and of his purchase are variously reported by Orloff and
Emmerich; helping to discredit any of their accounts. The following
interviews, though contradicting themselves in many important ways,
agree that the purchase of Orloff's *Soul of the Age,* and Orloff's and
Emmerich's subsequent development of that work into the script for
*Anonymous* happened sometime after October 10, 2000, the date that
Heusey met with Centropolis representative Petra Holtorf.

24. ComingSoon.net Interview/early 2012 Emmerich: "Yeah, this was
like ten years ago. Then I realized that it was with another company, so I
first had to wrestle it out from their hands - took me a year - and then I
kind of bought it with my own money and started developing with John
together. "

25. On information and belief, Orloff expressed surprise at receiving a
call from his agent informing him that Emmerich wanted to meet with
him to discuss writing *The Day After Tomorrow*. Orloff continues, "But
[my agent said Emmerich] really wants to meet you. This was 2002 or
'03. We sat down in Emmerich's office, and we talked about the project.

13

1   ...I said, 'I'm so flattered that you think I can do this. I'm not sure I can.

2   And I think quite frankly you can get a lot of writers who are way better

3   than me for this kind of material.' He said, 'Well, what else have you

4   written?' ...And I start doing my spiel (describing *Soul of the Age*). And I

5   could see he was really interested. He said he wanted to read it. And

6   about a week or two later, my agent called me up and said, 'Hold on to

7   your seat, Roland Emmerich wants to buy your script...and a week later

8   he bought it. He just paid for it out of his own pocket - owned the script.

9   I was surprised how much he liked it."

10  26.   Emmerich, speaking in 2011 to promote *Anonymous*: "Everyone

11  will ask themselves why is Roland Emmerich making a movie about

12  Shakespeare?...I was actually looking for scriptwriters to help me with

13  my script that I wrote at that time, 2002, called *The Day After Tomorrow*.

14  And I got a lot of reading samples and one of them was a script called

15  *Soul of the Age* by John Orloff...it was pretty much the basis of this film."

16  27. Plaintiff presents the following detail to further discredit Orloff's and

17  Emmerich's stories. On information and belief, Emmerich began

18  independently writing the script for his film *The Day After Tomorrow*

19  before September 11, 2001. He stopped writing it after the "9/11"

20  attacks, uncertain whether to proceed with a film about the destruction

14

1  of New York City. A production note indicates that Emmerich and writer

2  Jeffrey Nachmanoff had been writing a scene imagining the collapse of

3  Larsen B ice shelf "a few weeks" before its collapse. In fact, during

4  January 21, 2002 – March 7, 2002 the Larsen B sector collapsed and

5  broke up. This places Nachmanoff's involvement as a writer on *The Day*

6  *After Tomorrow* no later than early January, 2002. Nachmanoff

7  remained with the production through its completion. - On information

8  and belief, Emmerich was not in the market for a writer for *The Day*

9  *After Tomorrow* when he was supposedly interviewing Orloff for that

10  job. (Nachmanoff was also repped by CAA at this time.)

11  28.  In all accounts thus far, Emmerich's purchase of Orloff's script,

12  and his involvement in its development began after Centropolis had

13  access to Plaintiff's script. On information and belief, Orloff often credits

14  Emmerich for the infusion of the substantially similar political

15  characters, themes and subplots – all the elements that Emmerich had

16  access to in Plaintiff's Work, after Plaintiff's meeting with Centropolis in

17  October 2000.  However, as noted above, Orloff may have already had

18  access to the Work through other filmmakers represented by CAA.

19  Plaintiff prays to learn through the process of discovery the state of

20  Orloff's script in 2000; Plaintiff can find no copyrighted material by

1     Orloff predating 2005, when *Soul of the Age* was registered for

2     Copyright.

3                       **COPYRIGHT LAW**

4     29.   In the United States Constitution, Article One, Section 8, Clause 8 is

5     the basis of United States patent and copyright law:

6     " The Congress shall have power to promote the Progress of Science and

7     useful Arts, by securing for limited Times to Authors and Inventors the

8     exclusive Right to their respective Writings and Discoveries;"

9     30.   JUSTICE O'CONNOR: "The economic philosophy behind the clause

10    empowering Congress to grant patents and copyrights is that the

11    encouragement of individual effort by personal gain is the best way to

12    advance public welfare through the talents of authors and inventors in

13    'science and useful Arts.'"

14    31.   Recent settled law denies the value of "sweat of the brow," the

15    "labour of his own mind" that was intended to be intellectual property.

16    However, reviewing Clause 8 provides some insight: "securing...to

17    Authors and Inventors the exclusive Right to their respective Writings

18    and Discoveries." The word "respective" acknowledges that Inventors

19    discover and write, *and* that Writers discover and write.  Thus Clause 8

20    recognizes that writers must be rewarded  for their research, an integral

16

1    part of the writing process, spurred by curiosity, leading to new

2    observations and revealing new facts or ideas to be shared to the benefit

3    of the public, but reserving the initial pecuniary benefit and other rights

4    to the author. Justice O'Connor: "We agree with the Court of Appeals

5    that copyright is intended to increase, and not to impede, the harvest of

6    *knowledge*. But we believe the Second Circuit gave *insufficient* deference

7    to the scheme established by the Copyright Act for fostering the original

8    works that provide the seed and substance of this harvest. The rights

9    conferred by copyright are designed to assure contributors to the store

10   of knowledge a fair return for their labors. *Twentieth Century Music*

11   *Corp. v. Aiken,* 422 U.S. 151, 156 (1975).

12   32. However, historical facts, as well as ideas, even those generated or

13   revealed by the efforts of the writer, in recent case law are not in

14   themselves protected by copyright. However, please consider

15   JUSTICE O'CONNOR's opinion of the Court: Harper & Row,

16   Publishers, inc. v. Nation Enterprises, 471 U.S. 539 (1985):

17   "Although certain elements of the Ford memoirs, such as historical facts

18   and memoranda, were not *per se* copyrightable, the District Court held

19   that it was the totality of these facts and memoranda collected, together

20   with Ford's reflections, that made them of value to The Nation, [and]

17

1   this . . . totality . . . is protected by the copyright laws."

2                     **PROBATIVE SIMILARITIES**

3   33. Probative similarities between the works help to establish the

4   likelihood that the Defendant copied the Plaintiff's work. Unlike

5   *substantial* similarities, which are at the heart of the improper

6   appropriation inquiry, probative similarities may be found to exist even

7   in the unoriginal and non-copyrightable components of an original

8   work (such as historical fact and "ideas".)

9   34. The Plaintiff presents the following historical facts common to both

10   works to establish that the Defendants copied the Plaintiff's work,

11   praying to protect, not the individual historical facts, but the manner in

12   which they were woven into the fabric of a creative narrative. In both

13   works the Queen is dying, but has no heir, and so a political struggle

14   ensues to determine the next monarch of England. Though historically,

15   *many* pretenders competed for the throne of England, both film projects

16   choose to focus on the competition between King James of Scotland, the

17   Cecils, and the Earl of Essex. Both works employ the threat of Spain

18   taking advantage of the politically divided country. Both show Essex

19   charging in on the half-dressed aged Queen. Both works depict the

20   death of Burghley and his funeral. The Essex rebellion is the climax to

18

1    both dramas. Both works employ the idea that Essex has intercepted a

2    note from William Cecil intended for King James, promising him the

3    throne. Plaintiff discovered the basis for this element in an obscure

4    primary source, then imagined the specifics of the matter. It is very

5    unlikely that the Defendants can cite a source for this element,

6    demonstrating that they did at least copy from Plaintiff's Work.

7    35. Defendant Orloff spent over 10 years single-handedly researching

8    and developing *Soul of the Age*, at all times having the same resources

9    and material available to him that were available to Plaintiff, exploring

10   similar historical characters and contexts, but the use of the political

11   device to enhance his story did not occur to him. Orloff admits: "...

12   Roland posited this idea: 'Well, what if we made the movie about the

13   Elizabethan succession problem? Who was going to be king after

14   Elizabeth? Set the movie in that world,' which the script was not

15   originally about. The original script had none of that and Elizabeth

16   wasn't in the script at all that I originally wrote. If she is, it's one or two

17   short scenes. " Emmerich suggested this new "world" even though *Soul

18   of the Age* was already set in Elizabethan London of 1598. The "world"

19   of the film is changed by adding the political context and, as Plaintiff had

20   done in his Work, associating Shakespeare with that world.

36. Though both works share a few historical elements at the broadest level, little in either is actually historical in nature. Reviewer David Kathman warns, "Anybody watching this movie should be aware that virtually none of what it depicts is historically accurate." He also notes, "*Anonymous* assumes that the political content of Shakespeare's plays was much more direct and heavy-handed than anything supported by the historical record, and it hugely exaggerates the power of the plays as political tools..." (as does the Work) On information and belief, Emmerich concurs: "We are clearly stating in our film this is just another invention. It has to be an invention. And I believe that you can do no historical film ever which is not invention." The Prologue in *Anonymous* concurs, "Our Shakespeare is a cypher, a ghost; his biography made not by history, but by conjecture. His story not written with facts, but with...imagination." Orloff relates similar sentiment in his article in the *Wall Street Journal*: "The truth is, there's no truth in film – in any film. Even the films that we think are true, about real people in real places, actually aren't. "

## SUBSTANTIAL SIMILARITIES

37. In U.S. copyright law, *substantial* similarity is the standard used to determine whether a defendant has infringed the reproduction right of

20

1    a copyright. The standard arises out of the recognition that the exclusive

2    right to make copies of a work would be meaningless if infringement

3    was limited to making only exact and complete reproductions of a work.

4    38.    Generally, as noted in 1 M. Nimmer on Copyright § 39 at 166-167

5    (1975), "a work is not derivative unless it has substantially

6    copied from a prior work. If that which is borrowed consists merely of

7    ideas and not of the expression of ideas, then although the work may

8    have in part been derived from prior works, it is not a derivative work."

9    39.   The determination of when there is substantial similarity between

10   the forms of expression is necessarily subtle and complex. As Judge

11   Hand observed, "Obviously, no principle can be stated as to when an

12   imitator has gone beyond copying the 'idea,' and has borrowed its

13   'expression.' Decisions must therefore inevitably be ad hoc."

14   Nichols v. Universal Pictures Corp, 45 F.2d 119, 121 (2 Cir. 1930)

15   40.   A plaintiff who cannot satisfy the extrinsic test necessarily loses on

16   summary judgment, because a jury may not find substantial similarity

17   without evidence on both the extrinsic and intrinsic tests.  The extrinsic

18   test is an objective test based on specific expressive elements: the test

19   focuses on articulable similarities between the plot, themes, mood, plot,

20   scenes, characterizations, dialogue, and other detail.

21

41.  "Anonymous" of course is the Defendants' title and premise: Oxford uses Shakespeare as a "front".  In Plaintiff's Work, ELIZABETH responds to an inquiry, "Well - Christopher Marlowe is alive, living in Denmark, wanting to use 'William Shakespeare' as his pseudonym to maintain anonymity because some government agent would have - imagine Christopher Marlowe using William Shakespeare as a front!"

42.  The moods of both works are similar. Both works are political thrillers, tense with a country divided by the uncertainty of the succession, punctuated with sword fights and battles. In *Not Without Justice* William Shakespeare enters a world of court intrigue and murder, often by sword fight, to avenge the death of his son.   The Prologue in *Anonymous* speaks of a "darker story of quills and swords. Of power and betrayal."

43.  Speaking of *Anonymous* in his *Wall Street Journal* article, Orloff says, "I also wanted to tell a rocking good story and to express a theme that matters to me a great deal: that the pen is mightier than the sword." Emmerich concurred: "For me, the theme that 'the pen is mightier than the sword' is for me, the most important message of all."  That the pen is mightier than the sword is also the theme pervading *Not Without Justice.* Plaintiff's "Shakespeare" uses his words and his plays to help resolve

22

1   personal issues, to influence public opinion, and to help Essex win the

2   favor of the Queen.

3   44.  The two works use a similar device to tell their stories. Orloff

4   continued in an interview, "...and then figuring out how many flash

5   forwards, how many flashbacks?" Plaintiff was advised that it was too

6   strange and too confusing to include flashbacks within flashbacks in his

7   Work, but he trusted that they would work onscreen.  This idiosyncratic

8   element, used once in the previous century, is used in the alleged

9   infringing work; among other detail, both stories' flashbacks depict a

10  youthful version of the "Writer" of the plays in a romantic relationship.

11  45.  A story's plot, the unfolding of its actions, is an abstraction serving

12  to promote the general theme of a story.  History is necessarily linear

13  and ad hoc, but stories are structured and paced, the plot built from a

14  succession of incidents and dialogue designed and ordered more in the

15  form of an argument than a log of events. *Anonymous* is similar to *Not*

16  *Without Justice* in its minute detail and in its overall feel, but each work

17  exhibits different overall plots. Yet in both, the "Writer" of the plays has

18  a personal objective that must be achieved while his actions and choices

19  must also support Essex in his fight for the throne – all having to be

20  accomplished before the Queen passes. The A Plots coincide, but the

23

1   B Plots vary.  This very important creative juxtaposition, involving

2   Shakespeare (and/or his surrogate Oxford) and his plays into the

3   political snake pit described in both works, is the heart of both works.

4   46.   Both works employ the idea that Shakespeare's plays can be used

5   to achieve political favor.  *Anonymous* and Plaintiff's Work both present

6   plays to audiences to encourage specific behavior and to gauge their

7   reactions. In Plaintiff's Work, Essex says to Shakespeare, "Audiences

8   respond honestly at a play. Hiss at injustice. Cheer for justice." In

9   Plaintiff's Work, *on stage* as a battle ensues, Tamburlaine pursues and

10   slays his foe, then asks boastfully, "Now king of Bassoes, who is

11   conqueror?" The audience responds directly to that actor, standing to

12   applaud their real hero, chanting, "Essex! Essex! Essex!," In *Anonymous*

13   the audience engages in battle with the player soldiers.

14   47.   No author may copyright his ideas or the facts he narrates. 17 U.S.C.

15   § 102(b). *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 726,

16   n. (1971). And though *Not Without Justice* and *Anonymous* involve some

17   public domain historical incidents, the *selection and arrangement* of

18   historical incidents, as well as ideas, together building Plot, is copyright

19   protectable.  Early in both works, a constable leads a violent search for a

20   "secondary" writer, resulting in a large fire being set, followed by the

24

1  torture of this writer in the Tower.  In both, the writer is questioned

2  while an authority listens from a dark corner. In both, this writer "spits

3  blood" or "spits a tooth."  Early in both works the theatre is introduced

4  by following two characters walking through its many levels while a

5  comedic performance ensues.  Both works have Shakespeare receiving

6  his Coat of Arms, and then explaining in similar dialogue that the Latin

7  phrase "Non Sans Droit" means "Not Without…right." The *Anonymous*

8  character even delays the word "right" as indicated in the screenplay

9  *Not Without Justice*. In both works a young woman name Elizabeth

10  performs oral sex on the "Writer" of the plays. (Oxford/Shakespeare)

11  48.  As the court said in *Malkin v. Dubinsky,* 146 F.Supp. 111, 114 (S.D.N.

12  Y.1956): `While any one similarity taken by itself seems trivial, I cannot

13  say at this time that it would be improper for a jury to find that the over-

14  all impact and effect indicate substantial appropriation."

15  49.  The editing and rearranging of individual elements tends to reveal

16  new meanings and characterizations, and to define new relationships

17  between characters - elements which when woven together help create

18  the fabric of a fictionalized story and are all part of creative expression,

19  which in this case contributes to substantial similarity. Both works use

20  names for characters that audiences recognize from history, but what is

1    in a name?  Both works give similar unusual actions and habits to their

2    characters. Both characters named "Shakespeare" are depicted as

3    whoring, murderous, and womanizing.  (In the script handed back by

4    Holtorf to Plaintiff, one of the subjective notes expressed excitement at

5    the novel idea that Shakespeare was whoring around.)  "Reputation" is

6    important to both "Writers" in the two works.  Oxford must remain

7    anonymous because of his concern for his reputation. In both, Cecil has

8    a sarcastic disposition, though there is no historical basis for that choice.

9    In both, Southampton is described as "Pretty."  Historically, Oxford did

10   not support Essex's pretensions to the throne.  However, central and

11   constant to both works, is Essex's determination to become King of

12   England and the actions of Shakespeare/Oxford that support Essex. In

13   Plaintiff's Work, Essex declares, "No, I will ascend to England's throne,

14   but with the love of the Queen and the love of her people." In *Anonymous*

15   OXFORD tells Essex, "No. If this is to be done, it must be done carefully,

16   skillfully."  In *Not Without Justice* ESSEX, inciting his army to civil war,

17   declares, "YOU are England's army...you and the people must decide

18   who is England's next King!" In *Anonymous,* OXFORD says, "I desire

19   nothing more than to see the next king be the rightful king. But what

20   Essex contemplates will surely lead to Civil War." Also, that Shakespeare

26

1    killed Marlowe is key to Plaintiff's plot, but the mention of Marlowe's

2    "death by Shakespeare" is included in Defendants' Work (history shows

3    that Marlowe died six years prior to the period depicted in *Anonymous*.)

4    In both works, Marlowe died soon after *threatening* to reveal a secret

5    damning to Shakespeare's reputation.

6    50.    In the Work, Shakespeare says, "My pen is my sword. And, my lord,

7    as your sword is your sword - most sharp – my word is my word." And

8    later: Shakespeare says to Essex, "Words are my conquering sword. I

9    wish my pen to serve honor." In *Anonymous*, ESSEX says to Oxford

10    (surrogate Shakespeare), "And when did words ever win a kingdom? I

11    think I'll Keep my sword, thank you very much."

12    51.    In Plaintiff's Work, an action is described, "Will, as the Ghost of

13    Hamlet, stands behind the curtain, but still in view of the audience. Will

14    watches Mr. Hamlet (for a reaction)...then scans the audience." and later:

15    "Shakespeare stands behind the curtain, watching his audience."

16    In *Anonymous*: "Oxford watches from behind a curtain, carefully

17    observing the Queen's reaction."

18    52. In both works Essex attends the play a "Midsummer Night's Dream"

19    with his Queen. In *Not Without Justice* Shakespeare watches from

1    behind the curtain of this particular play's performance. In *Anonymous*,

2    Oxford watches from behind the curtain.

3    53.    In Plaintiff's work, WILL declares, "...I give a damn that 800

4    groundlings four times a week will pay a pence to see my plays and I

5    will be paid – I will earn 1 pence for every 10 paid." In *Anonymous*:

6    OXFORD inquires, "Henry, how many people were at that play?"

7    SOUTHAMPTON replies, "Hmm? I'm not sure, two thousand, maybe

8    more." OXFORD continues, "And how many performances are there of a

9    play like that?" SOUTHAMPTON obliges, "Five or six I suppose." OXFORD

10   surmises, "Ten thousand souls. All listening to the writings of one man -

11   the ideas of one man. That's power, Robert."  Furthermore this is

12   another example of the creative juxtaposition that Defendants

13   discovered in the Work: the power of Shakespeare/Oxford's pen to

14   influence Elizabethan politics, the heart of *Not Without Justice*.

15   54.    In *Not Without Justice* Marlowe pawns off an unwanted

16   assignment to Shakespeare: William Cecil commissions him to write

17   poems encouraging Southampton to marry. In *Anonymous,* Ben pawns

18   off an unwanted assignment to Shakespeare: being a front for Oxford.

19   55.    In both works, when Shakespeare/Oxford refuses to cooperate,

20   Robert Cecil cunningly suggests his dire option: death.

1   56.  In both, Shakespeare/Oxford's wife Anne berates him for writing.

2   57.  In both works the Cecils contemplate arresting Shakespeare.

3   58.  Both works use the play "Richard II"/"Richard III" to inspire a mob,

4   one example of a superficial alteration that fails to efface infringement.

5   59.  Both works use the poem "Venus and Adonis" to seduce a young

6   Elizabeth. In Plaintiff's work, "My lies will live - yet even when all the

7   Breathers of this world are dead." In *Anonymous* the PROLOGUE says,

8   "(our poet's story) shall be remembered...as long as words are made of

9   breath and breath of life.

10   60.  In both works, Cecil offers Shakespeare/Oxford the opportunity to

11   be excused of murder, suggesting self-defense as an alibi that would be

12   accepted if he cooperates with Cecil's purposes.

13   61.  In *Not Without Justice* action is described: "Confronting Will,

14   Marlowe knows that he's getting very close to a compromising truth." In

15   *Anonymous*, an action is described: "Jonson looks up. Marlowe smiles,

16   knowing he is closer to the truth."

17   62.  An Intrinsic test is also used by the Court to determine substantial

18   similarity.  This test considers the impressions of ordinary observers: as

19   already mentioned, London resident Tasha Brown brought *Anonymous*

20   to  Plaintiff's  attention,  after  having  recognized  in  Defendants'

1  promotional trailer what seemed to her to be Plaintiff's Work, other

2  people who were familiar with Plaintiff's screenplay, *Not Without Justice*

3  also contacted Plaintiff after having seen the promotional trailer – all

4  after not having read the project for years.

5  63.   (Oct. 12, 1977). 562 F.2d 1157 Sid & Marty Krofft Television

6  Productions, Inc., Plaintiffs-Appellants, v. McDonald's Corporation and

7  Needham, Harper & Steers, Inc., presents an example of a commercial

8  spot appropriating elements of a television show to be used in the

9  marketing of a product. Plaintiffs prevailed on claims of appropriation

10  of characters and settings. Circuit Judge James Carter:  "In the context of

11  this case, the distinction between these (Extrinsic and Intrinsic) tests is

12  important. *Defendants* do not dispute the fact that they copied the idea

13  of plaintiffs' PufnStuf television series -- basically a fantasyland filled

14  with diverse and fanciful characters in action.  They argue, however,

15  that the expressions of this idea are too dissimilar for there to be an

16  infringement. They come to this conclusion by dissecting the constituent

17  parts of the PufnStuf series -- characters, setting, and plot -- and

18  pointing out the dissimilarities between these parts and those of the

19  McDonaldland commercials.  This approach ignores the idea-expression

20  dichotomy alluded to in Arnstein and analyzed today. Defendants

30

1    attempt to apply an extrinsic test by the listing of dissimilarities in

2    determining whether the expression they used was substantially similar

3    to the expression used by plaintiffs.  That extrinsic test is inappropriate;

4    an intrinsic test must here be used." Circuit Judge James Carter

5    continues: "We have viewed representative samples of both the H. R.

6    Pufnstuf show and McDonaldland commercials.  It is clear to us that

7    defendants' works are substantially similar to plaintiffs'.  They have

8    captured the 'total concept and feel' of the PufnStuf show." Plaintiff

9    asserts that each of the promotional trailers and commercial spots (6

10   that are known to the Plaintiff) captures the total concept and feel of the

11   Plaintiff's Work, as does the initial infringing work, the film *Anonymous*.

12     64.    Considering the substantially similar theme, mood, structure,

13   characters, interactions between the parallel characters , subplots, and

14   other detail found in *Anonymous,* allegedly created and written by

15   Defendants Orloff and Emmerich, and *Not Without Justice*, created and

16   written by Plaintiff Heusey - and the direct access Defendants had to

17   view Plaintiff's Work - there is no possibility the similarities are the

18   product of mere coincidence.  These similarities substantially infringe

19   upon the Plaintiff's Work.

20

31

1                 **FAIR USE  - §107, Copyright Act**

2   65.   §107 of the Copyright Law requires a case-by-case determination

3   whether a particular use is fair, and the statute notes four *nonexclusive*

4   factors to be considered.  Justice O'Connor: "(fair use) doctrine is an

5   equitable rule of reason, no generally applicable definition is possible,

6   and each case raising the question must be decided on its own facts.

7   H.R.Rep. No. 94-1476, p. 66 (1976).

8                 **FAIR USE:  PURPOSE**

9   66.   The purpose of both works is commercial gain. JUSTICE

10   O'CONNOR: " The fact that a publication was commercial, as opposed to

11   nonprofit, is a separate factor that tends to weigh against a finding of

12   fair use. Every commercial use of copyrighted material is presumptively

13   an unfair exploitation of the monopoly privilege that belongs to the

14   owner of the copyright. The crux of the profit/nonprofit distinction is

15   not whether the sole motive of the use is monetary gain, but whether

16   the user stands to profit from exploitation of the copyrighted material

17   without paying the customary price. *See Roy Export Co. Establishment*

18   *v.Columbia Broadcasting System, Inc.,* 503 F.Supp. at 1144; 3 Nimmer §

19   13.05[A][1], at 13-71, n. 25.3.

20

32

1             **FAIR USE:** CHARACTER OF COPYRIGHTED WORK

2    67. Plaintiff was diligent in protecting the confidential nature of his

3    work, having interested parties sign an NDA before submitting work

4    for their consideration, and/or submitting the Work through his

5    attorney. JUSTICE O'CONNOR: "In the case of Mr. Ford's manuscript, the

6    copyright holders' interest in confidentiality is irrefutable; the copyright

7    holders had entered into a contractual undertaking to "keep the

8    manuscript confidential" App. to Pet. for Cert. 1C-20. While the

9    copyright holders' contract with Time required Time to submit its

10   proposed article seven days before publication, The Nation's

11   clandestine publication afforded no such opportunity for creative or

12   quality control. App. 300b-300c (testimony of Victor Navasky). A use

13   that so clearly infringes the copyright holder's Interests in

14   confidentiality and creative control is difficult to characterize as "fair."

15      *68.* The fact that a work is unpublished is a critical element of its

16   "nature." 3 Nimmer § 13.05[A]; Comment, 58 St. John's L.Rev. at 613.

17   The scope of fair use is narrower with respect to unpublished works.

18   69. Clause (3) of § 106 of the Copyright Act, establishes the exclusive

19   right of publications, an important marketable subsidiary right. Under

20   this provision, the copyright owner has the right to control the first

1    public distribution of an authorized copy of his work, including whether

2    to and in what form to release his work. First publication is inherently

3    different from other §106 rights in that only one person can be the first

4    publisher. The commercial value of the right lies primarily in exclusivity.

5    Because the potential damage to the author from judicially enforced

6    sharing of the first publication right with unauthorized users of his

7    manuscript is substantial, the balance of equities in evaluating such a

8    claim of fair use inevitably shifts.  The unpublished nature of a work is a

9    key, though not necessarily determinative,  factor tending to negate a

10   defense of fair use. - JUSTICE O'CONNOR opinion/ Ford Case:  Harper &

11   Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985):

12   "Perhaps because the fair use doctrine was predicated on the author's

13   implied consent to 'reasonable and customary' use when he released

14   his work for public consumption, fair use traditionally was not

15   recognized as a defense to charges of copying from an author's as yet

16   unpublished works.  Under common law copyright, the property of the

17   author in his intellectual creation was absolute until he voluntarily

18   parted with the same.  ...Defendant's use had not merely the incidental

19   effect, but the intended purpose, of supplanting the copyright holder's

20   commercially valuable right of first publication and his commercially

34

1  valuable expression. The trial court found that The Nation knowingly

2  exploited a purloined manuscript. App. to Pet. for Cert. B-1, C-20 - C-21,

3  C-28 - C-29. Unlike the typical claim of fair use, The Nation cannot offer

4  up even the fiction of consent as justification. Fair use distinguishes

5  between `a true scholar' and a chiseler who infringes a work for

6  personal profit."

7  <div align="center">**FAIR USE:** EFFECT ON THE MARKET</div>

8  70.  This last factor is the most important element of fair use. *See* 3

9  Nimmer § 13.05[A], at 13-76, and cases cited therein. "Fair use, when

10  properly applied, is limited to copying by others which does not

11  materially impair the marketability of the work which is copied."

12  71.  As described herein, Defendants included elements in their work

13  that do not support their theme, plots, or subplots, willfully attempting

14  to supplant Plaintiff's work, by making the Work redundant.

15  72.  *Folsom v. Marsh,* 9 F.Cas. 342, 344-345 (No. 4,901) (CC Mass.)

16  "...The fair use doctrine has always precluded a use that "supersede[s]

17  the use of the original." *Ibid. Accord,* S.Rep. No. 94-473, p. 65 (1975).

18

19

20

1                                **CLAIM I**

2          **Direct Copyright Infringement, 17 U.S.C. §§ 101 et seq.**

3      73.  Plaintiff repeats and alleges every allegation in paragraphs 1

4    through 72 as if set forth herein in length.

5      74.  Plaintiff owns copyright interests in Plaintiff's Work as evidenced

6    by his copyright registration and application. (Please see Appendix A).

7      75.  Plaintiff maintains the exclusive right to prepare derivative works

8    based upon the copyrighted Work, pursuant to 17 U.S.C. § 106.

9      76.  Pursuant to 17 U.S.C. § 501, anyone who violates any of the

10   exclusive rights of the copyright owner is an infringer of the copyright

11   or right of the author.

12     77.  At no point in time did Plaintiff authorize any Defendant to exploit

13   *Not Without Justice* in any manner whatsoever.

14     78.  Defendant Orloff is improperly credited as the sole writer of

15   *Anonymous,* as the Defendants have chosen to not recognize the

16   substantial contributions of Plaintiff to their story. Plaintiff also

17   maintains the right to be credited for his contributions to the

18   Defendants' work.  Plaintiff is harmed not only be the direct loss of

19   potential profit in the Work, but also by not having received credit of

20   any kind for his Work.  The Writers Guild of America recognizes the

                                                                          36

1  importance of credits; credit affects reputation, union membership, and

2  future income.

3  79.  On information and belief, Plaintiff asserts willful and direct

4  infringement by Defendants Emmerich, Orloff, and Centropolis

5  Entertainment, accomplished through their willful acts of copying, use,

6  modification, reproduction, display and distribution of elements found

7  in Plaintiff's Work and then embodied in the film *Anonymous*, including

8  without limitation, elements that embody expression of ideas and

9  concept, themes, subplots, and characterization contained therein and

10  all derivatives thereof. These actions herein described constitute a

11  violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a),

12  106(2), and all Defendants were acting as infringers within the meaning

13  of Title 17 U.S.C. §§ 501(a).

14  80.  On information and belief, Defendants continue to exploit said

15  elements through DVD and Internet sales, and other licensing

16  arrangements. Each new infringement by Defendants constitutes a

17  separate and distinct act of infringement.

18  81.  Defendants' acts of infringements were willful and in disregard of

19  and with indifference to the rights of Plaintiff.

20  82.  On information and belief, all Defendants received a direct

37

1 financial and economic benefit from the infringement of Plaintiff's

2 copyright in his Work, *Not Without Justice.*

3 83. Defendants' conduct described and alleged herein was for the

4 purpose of injuring Plaintiff in his business, and has injured in Plaintiff

5 in his business directly through loss of income, and indirectly through

6 loss of credit and reputation.

7 84. As a result of Defendants' actions, Plaintiff has been damaged in

8 an amount to be determined at a trial of this action, which, upon

9 information and belief, exceeds the sum of $2.8 million.

10 **CLAIM II**

11 **Contributory Copyright Infringement**

12 85. Plaintiff incorporates by reference each and every allegation

13 embodied in paragraphs 1 through 84, inclusive, as if fully set forth

14 herein.

15 86. On information and belief, Plaintiff asserts that Defendants

16 Emmerich, Peter Northbourne James, Petra Holtorf have initially and

17 continually contributorily infringed on the Plaintiff's copyrighted Work

18 by inducing and encouraging direct infringement by other Defendants

19 as has been set forth in detail throughout this complaint, though not

20 exhaustively. Plaintiff prays that he will have the opportunity through

1  the process of discovery and through trial to reveal other details that he

2  is confident will describe the truthful timeline and circumstances of the

3  development of *Soul of the Age* into the film *Anonymous,* and the

4  infringing use of *Not Without Justice* therein.

5  87.  Through their conduct herein alleged, said Defendants willfully,

6  knowingly and systemically induced, caused, materially contributed to

7  and participated in the misappropriation and infringement of Plaintiff's

8  Work, *Not Without Justice,* for purposes of commercial advantage or

9  private financial gain.

10  88.  Defendants' conduct described and alleged herein was for the

11  purpose of injuring Plaintiff in his business, and has injured in Plaintiff

12  in his business directly through loss of income, and indirectly through

13  loss of credit and reputation.

14  89.  As a result of Defendants' actions, Plaintiff has been damaged in

15  an amount to be determined at a trial of this action, which, upon

16  information and belief, exceeds the sum of $2.8 million.

17

18

19

20

## CLAIM III

## Vicarious Copyright Infringement

90.  Plaintiff incorporates by reference each and every allegation embodied in paragraphs 1 through 89, inclusive, as if fully set forth herein.

91.  On information and belief, Defendants Emmerich, Centropolis, Relativity Media, Anonymous Pictures, Columbia Pictures, and Sony Pictures Entertainment, produced and/or distributed, or arranged the distribution of *Anonymous* through motion picture exhibitors throughout the world, cable companies, DVD, online distribution, and potentially other licensing arrangements. Such exploitations constitute infringements of Plaintiff's copyright in his Work, including his exclusive rights of reproduction, distribution, and public performance, pursuant to 17 U.S.C. §§ 106 and 501.

92.  On information and belief, Defendants Relativity Media, Sony Pictures Entertainment, Columbia Pictures, and Anonymous Pictures, all have an obligation to perform a diligent, complete and thorough title search, evidencing the chain of title and actual genesis of any project, as well as the right and ability to supervise and control the infringing conduct of their exhibitors, their cable, online and DVD companies and

1    other persons or entities exploiting the film. Defendants have not

2    exercised such diligence or supervision to the extent demanded by the

3    law. As a direct and proximate result of such refusal, Defendants have

4    negligently contributed to the infringed Plaintiff's copyrights in

5    Plaintiff's Work.

6    93.   Defendants derive a direct financial benefit from this

7    infringement, including but not limited to, improved reputations,

8    increased sales and increased value of Defendants' film libraries and/or

9    businesses, arising from the use of Plaintiff's Work.

10    94.   Each such infringement for which Defendants are vicariously

11    liable constitutes a separate and distinct act of infringement.

12    95.   As a result of Defendants' acts and conduct, Plaintiff sustained and

13    will continue to sustain substantial, ongoing injury for which there is no

14    adequate remedy at law. Defendants' conduct described and alleged

15    herein was for the purpose of injuring Plaintiff in his business, and has

16    injured in Plaintiff in his business directly through loss of income, and

17    indirectly through loss of credit and reputation.

18    96.   As a direct and proximate result of the infringements by

19    Defendants, Plaintiff is entitled to damages and to a percentage of

20    Defendants' revenue in amounts to be determined at trial, as they are

1    not currently ascertainable. Alternatively, Plaintiff is entitled to

2    maximum statutory damages of $150,000, or in such other amount as

3    may be proper under 17 U.S.C. § 504(c).

4    <div align="center">**CLAIM IV – X**</div>

5    <div align="center">**Direct Copyright Infringement, 17 U.S.C. §§ 101 et seq.**</div>

6    97.   Plaintiff repeats and alleges every allegation in paragraphs 1

7    through 96 as if set forth herein in length.

8    98.   Plaintiff maintains the exclusive right to prepare derivative works

9    based upon the copyrighted Work, pursuant to 17 U.S.C. § 106.

10   99.   On information and belief, Plaintiff asserts direct infringement by

11   Defendants Emmerich, Centropolis Entertainment, Columbia Pictures,

12   Sony Pictures, Relatiity Media, and Anonymous Pictures, accomplished

13   through their willful acts of copying, use, modification, reproduction,

14   display and distribution of elements derived from Plaintiff's Work and

15   then embodied in the various promotional video and commercial spots

16   promoting the film *Anonymous*, including without limitation, elements

17   that embody expression of ideas and concept, themes, subplots, and

18   characterization contained therein and all derivatives thereof. These

19   actions herein described constitute a violation of the United States

1    Copyright Act, Title 17 U.S.C. §§ 501(a), 106(2), and all Defendants were

2    acting as infringers within the meaning of Title 17 U.S.C. §§ 501(a).

3    100.    In 2011 on the website Pittsburgh Movie Examiner, Debra

4    Peterson wrote, "Columbia Pictures has released several new preview

5    clips for *Anonymous*...At first glance, the film seems an unusual choice

6    for Emmerich, who is best known for his blockbuster action movies. But

7    the five preview clips, released Sept. 15, help market the movie as being

8    more of a political thriller than a sedate costume drama about the Bard.

9    After all, the authorship question is only part of the movie's scope,

10   which involves political power plays, conspiracies, and romance in

11   Elizabethan England. These different threads come together because of

12   the plays, because as one of the film clips say, 'All art is political.'"

13   101.   An analysis of the official 2:00 minute-long trailer (see Appendix

14   B, Exhibit 4) shows that the producers intentionally mislead viewers.

15   None of the characters are defined, allowing the voiceover to give the

16   sense that the man who is actually Oxford is Shakespeare. Out of the

17   1:40 minutes of descriptive content in the video, 1:05 minutes of the

18   video content can be attributed to Plaintiff's Work.

19   102.  As mentioned earlier, Tasha Brown of London contacted Plaintiff,

20   assuming that the promotional video that she saw was promoting a film

43

1    based on Plaintiff's Work.  Two other people – both ordinary reasonable

2    people - contacted Plaintiff within the first month of the airing of the

3    commercial spots promoting *Anonymous* in the United States.

4     103.  See International Luggage Registry v. Avery Products Corp., supra,

5    541 F.2d at 831; Harold Lloyd Corp. v. Witwer, 65 F.2d 1, 18-19 (9 Cir.

6    1933).  "The test to be applied in determining whether there is

7    substantial similarity in expressions shall be labeled an intrinsic one –

8    depending on the response of the ordinary reasonable person. "

9    104.  On information and belief, Defendants continue to exploit said

10   elements through the online presence of the videos.

11   105.  Defendants' acts of infringements were willful and in disregard of

12   and with indifference to the rights of Plaintiff.

13   106.  On information and belief, all Defendants received a direct

14   financial and economic benefit from the infringement of Plaintiff's

15   copyright in his Work, *Not Without Justice.*

16   107.  Defendants' conduct described and alleged herein was for the

17   purpose of injuring Plaintiff in his business, and has injured in Plaintiff

18   in his business directly through loss of income, and indirectly through

19   loss of credit and reputation.

1   108.   As a result of Defendants' actions, Plaintiff has been damaged in

2   an amount to be determined at a trial of this action, which, upon

3   information and belief, exceeds the sum of $2.8 million.

4   <center>**CLAIM XI**</center>

5   <center>**Fraud**</center>

6   109. Plaintiff incorporates by reference each and every allegation,

7   specifically the damages to Plaintiff resulting from all Defendants'

8   actions or lack of actions, embodied in paragraphs 1 through 108,

9   inclusive, as if fully set forth herein.

10  110. On information and belief, Defendant James knowingly and

11  intentionally, deceived Plaintiff by stating that he intended to create a

12  visual effects breakdown and budget, persuading Plaintiff to share his

13  Work with Defendant James, who was adamantly committed to giving

14  the script to Defendant Holtorf, a representative of Defendants

15  Emmerich and Centropolis Entertainment.

16  111. On information and belief, Defendant James knew that Defendants

17  Emmerich and Centropolis Entertainment, perhaps in collusion with

18  Creative Artists Agency, were or would be developing Defendant Orloff's

19  script *Soul of the Age,* but concealed this information from Plaintiff.

1    112. Relying upon Defendant James false pretense, as evidenced by the

2    Confidentiality Agreement signed by James, Plaintiff entrusted him with

3    a printed version of *Not Without Justice.*

4    113. Subsequently Defendant James, against Plaintiff's express

5    demands to the contrary, presented the script to Defendant Holtorf,

6    knowing that the act could never truly be undone. Plaintiff points to the

7    Arrow Information Paradox named after Kenneth Arrow, American

8    economist and joint winner of the Nobel Memorial Prize in Economics.

9    The Arrow Information Paradox describes a problem that companies

10   face when managing intellectual property across their boundaries.  A

11   fundamental tenet of the paradox is that a potential purchaser of

12   intellectual property wants to know the contents of the intellectual

13   property in sufficient detail as to understand its potential so as to decide

14   whether or not to buy it. Once the customer has this detailed

15   knowledge, however, the seller has in effect transferred the intellectual

16   property to the customer without any compensation.

17   114. Though typically applied in legitimate transactional affairs, this

18   paradox is easily applied to theft of intellectual property.  Though

19   Defendant Holtorf, acting on behalf of Emmerich and Centropolis

20   Entertainment, returned the hard copy of the script to Plaintiff, in effect

1   the Defendants had acquired the Work embodied in the script.

2   Furthermore a likelihood exists, given the level of detail in the

3   similarities, that the Defendants had physically copied the script prior to

4   returning the original pilfered hard copy to Plaintiff. Physical copying is

5   also inferred from stressed state of the brass brads binding the printed

6   screenplay.

7   115.  Defendant James asked for an updated script once, seemingly to

8   accomplish his proposed purposes, however, ignoring requests by

9   Plaintiff, James never did generate or present a breakdown or budget to

10   facilitate the planning of the visual effects intended for the production of

11   *Not Without Justice.*

12   116. Defendants use of substantial elements that had no relevance to

13   their story show a willful attempt to replace Plaintiff's Work in any

14   potential market. Defendants' conduct described and alleged herein was

15   for the purpose of injuring Plaintiff in his business, and has injured in

16   Plaintiff in his business.

17   117. The marketing and distribution of *Anonymous* and its ill success in

18   the market have all combined to substantially interfere with Plaintiff's

19   ability to market his Work. As this damage is difficult to calculate, but

1    considering the willful nature of the Fraud, Plaintiff seeks at a minimum,

2    damages of $2.8 million.

3                              **REQUEST FOR RELIEF**

4      118.  Addressing U.S. 1332, the sum of the losses attributable to the lack

5    of credit given to Plaintiff for his Work is difficult to calculate but

6    certainly greater than $75,000.  Plaintiff seeks damages of $2.8 million.

7      119.  Using Plaintiff's Work, which he reasonably protected, as

8    embodied in the Defendants' film *Anonymous*, has severally benefited

9    the Defendants.  Plaintiff has been damaged in an amount to be

10   determined at trial including, but not limited to, the value of Plaintiff's

11   ideas and expression, and loss of a share of the fees and income shared

12   by the various Defendants.

13   120.  Defendants have severally received substantial gains, advantages,

14   and benefits directly and indirectly by appropriating Plaintiff's Work

15   and passing off several substantial and attractive elements as their

16   original work.

17   121.  As evidence by interviews with Defendants Orloff and Emmerich,

18   the development of *Soul of the Age* would not have continued without

19   the   infusion of the substantial elements taken from the trove found in

20   Plaintiff's *Not Without Justice*.  Orloff's *Soul of the Age* would not have

48

1     become *Anonymous,* with its inherent theme of the pen being mightier

2     than the sword, and all the elements supporting this theme – many of

3     which were appropriated from *Not Without Justice. Anonymous* would

4     not have been produced.    Therefore any and all fees and income

5     "earned" by the Defendants from the development, production, and

6     distribution are attributable to *Not Without Justice.*

7     122. It is inequitable and unjust for the Defendants to not share an

8     equitable portion of those gains, advantage and benefits with the

9     Plaintiff. The Plaintiff prays that an allocation of an equitable portion to

10    the Plaintiff should consider not only the relevance of Plaintiff's Work to

11    the very existence of *Anonymous* as described in previous paragraph,

12    and not only the many instances of the many elements severally, but

13    also the juxtaposition of these elements to create and support various

14    overall plots, themes, and characterizations. The allocation to Plaintiff

15    of an equitable portion should also the consider how substantially the

16    overall poached element, device, theme, or plot influenced the re-telling

17    of their original script, as well as how substantial that element, device,

18    theme, or plot was to Plaintiff's Work.

1   123.  WHEREFORE, Plaintiff respectfully prays that this Court enter

2   judgment against the Defendants in Plaintiff's favor, jointly and

3   severally, as follows:

4       a.    That the Court finds that the Defendants have infringed on

5   Plaintiff's copyright in the Work, granting Plaintiff Heusey no

6   compensation or credit. Prior case law acknowledges that it is difficult

7   to calculate the compensation due to a person for the loss, but in this

8   case, Plaintiff prays that the Court will consider not only the immediate

9   loss of income from appropriation of a specific work, but the loss of

10  prestige and advancement in his career affectuated by the lack of credit

11  for his Work as embodied in the film *Anonymous*. The Writers Guild

12  literature asserts that credits are the 'life blood' of the industry. In Veith

13  v. Northern Exposure, the jury awarded $4.5 million for the writer's loss

14  of credit. Plaintiff conservatively seeks $2.8 million to compensate him

15  for this loss over the last 14 years.

16      b.    Temporary and permanent injunctions, pursuant to 17

17  U.S.C. § 502, enjoining all Defendants, their agents, employees, and all

18  other persons, in active concert or individually, from directly or

19  indirectly further infringing upon Plaintiff's copyright or from

20  continuing to market, offer, sell, dispose of, license, lease, transfer,

1  display, advertise, reproduce, develop or manufacture any *new* works

2  derived, copied, and/or sampled from the Work in any fashion

3  whatsoever or to participate or assist in any such activity.

4      c.   That judgment be entered for the Plaintiff against the

5  Defendants for any profits attributed to infringements of Plaintiff's

6  copyrighted Work, calculating an appropriate percentage of gains,

7  profits, and advantages derived by Defendants, jointly and severally,

8  from their acts of infringement, and other violations of law, including

9  acts of fraud, to be disgorged and transferred to the benefit of the

10  Plaintiff. An appropriate disgorgement should not simply be determined

11  by the numbers, but give considerable weight to the substantial

12  importance of the many elements embodied in *Anonymous*, that took the

13  "heart out of" the Plaintiff's Work, *Not Without Justice*.

14      e. That Defendants be required to submit to the Plaintiff a

15  complete and accurate accounting of all revenue it has generated in

16  connection with the exploitation of *Anonymous*.

17      f.  Recovery from all Defendants of the damages, including pre-

18  judgment interest if sustained and will sustain, and any income, gains,

19  profits, and advantage obtained by Defendants as a result of their

20  wrongful acts alleged herein above pursuant to the Copyright Act of

51

1    1976, 17 U.S.C. § 504(b), in an amount which cannot yet be fully

2    ascertained, but which shall be assessed at the time of the trial.

3        g.    That Plaintiff have judgment against the Defendants for

4    Plaintiff's allowable costs, disbursements, and attorney fees pursuant to

5    the Copyright Act of 1976, 17 U.S.C. § 101 et seq., and other such relief as

6    the Court deems proper to do justice to the parties.

7        h.    Declarative relief that the Defendants infringed on the

8    Plaintiff's copyright.

9        i.    Plaintiff prays that he is entitled to equitable relief ensuring

10   that he is credited for his contributions to *Anonymous* because the four

11   factor test governing the granting of equitable relief, explained in eBay,

12   Inc. v. MercExchange, 547 U.S. 388, 391 (2006) has been satisfied:

13        1.    Plaintiff has suffered irreparable injury and has no

14   recourse through the law because the right of attribution is not

15   statutorily recognized.

16        2.    Monetary damages alone are inadequate to

17   compensate the Plaintiff for the damage to his professional writing

18   reputation and the development of his career. Moreover,

19   acknowledgement in and of itself is intrinsically valuable to human

52

1   beings who have devoted significant portions of their lives to a project;

2   in this case well over 7 years.

3          3.   Crediting Plaintiff would impose no undue hardship

4   on any Defendant.

5          4.   The   public   interest   would   be   served   by

6   acknowledgment, as it would be made aware of the true creator of many

7   substantially important elements of a work that gained the attention of

8   at least the academic world. Furthermore, Plaintiff Heusey would be

9   encouraged to continue developing the various historically-based

10  projects that he had been developing, but has cautiously shelved until

11  he finds a resolution to this question. It is the intention of the Copyright

12  Act to encourage creativity and the pursuit and distribution of

13  knowledge. The Plaintiff has been discouraged emotionally and

14  pragmatically from continuing his pursuits.

15                    **SPOLIATION NOTICE**

16  124. All Defendants are hereby put on notice to preserve any and all

17  materials relating to the claims contained within this Complaint, and

18  any and all materials, or facts, which are relevant to the resolution of the

19  issues contained herein, construed in the  broadest possible way.

20

1          **DEMAND FOR JURY TRIAL**

2     Plaintiff hereby demands a jury trial on all claims and issues so triable.

3                                    ********

4                                          Respectfully submitted,
5                                          KENNETH HEUSEY, pro se
6
7
8                                          Kenneth R. Heusey
9                                          109 Smithfield Street
10                                         Pittsburgh, PA 15222
11                                         T: (310) 963-6772
12                                         kenheusey@gmail.com
13
14                   date 12/15/14

1       **VERIFICATIONS**

2       VERIFICATION – KEN HEUSEY

3       I, Kenneth Heusey, hereby state that I am the Plaintiff in this action and

4       that the statements of fact made in Plaintiff's Complaint Copyright

5       Infringement & Related Claims are true according to my personal

6       knowledge, except as to those matters stated on information and belief,

7       and as to those matters I believe them to be true.

8               KENNETH HEUSEY

9

10              date_12/15/14_____

11

**CERTICATE OF SERVICE**

1

2    I hereby certify that a true and correct copy of the foregoing Plaintiff's

3    Complaint Copyright Infringement & Related Claims has been or is being

4    filed with the Court of record and thereafter being served to all

5    Defendants as listed below:

6

7

8

9

10

11

12

13

14   Respectfully submitted,

15                                              KENNETH HEUSEY, pro se

16

17

18                                              (Kenneth R. Heusey
19                                              109 Smithfield Street
20                                              Pittsburgh, PA 15222
21                                              T: (310) 963-6772
22                                              kenheusey@gmail.com
23
24                                              date 12/15/14
25

56

1   **Roland Emmerich**
2   Centropolis Entertainment, Inc.
3   1445 N. Stanley Avenue, 3rd Floor
4   Los Angeles, CA 90046
5   (323)850-1212
6   Fax: (323)850-1201
7   info@centropolis.com
8
9
10  **John Orloff**
11  415 Schoolhouse Road
12  Ghent, N.Y 12075
13
14
15  **Peter Northbourne James**
16  13274 Fiji Way
17  Marina del Rey, CA 90292
18
19
20  **Petra Holtorf-Stratton**
21  1909 Oxley Street
22  South Pasadena, CA 91030
23
24
25  **Centropolis Entertainment, Inc.**
26  1445 N. Stanley Avenue, 3rd Floor
27  Los Angeles, CA 90046
28  (323)850-1212
29  Fax: (323)850-1201
30       Agent for Service of Process:  Bradley Ross
31
32
33  **Relativity Media Films, LLC**
34  9242 Beverly Blvd.
35  Beverly Hills, CA 90210
36  (310 724-7700
37       Agent for Service of Process:  Paracorp Incorporated (C1082536)
38
39

**Anonymous Films**
     25 Golden Square
     London W1F 9LU


**Columbia Pictures Industries, Inc.**
10202 W. Washington Blvd., Culver City, CA. 90232
T: (310) 244-4000
F: (310)244-2626
     Agent for Service of Process:  Sony Pictures Entertainment, Inc.
          (Status: active)


**Sony Pictures Entertainment, Inc.**
10202 W. Washington Blvd., Culver City, CA. 90232
T: (310) 244-4000
F: (310)244-2626

     Agent for Service of Process:  Leonard Venger
          (Status: active)

# APPENDIX A

## EXHIBIT #1
## Copyright Registration

**CERTIFICATE OF REGISTRATION**

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

**REGISTER OF COPYRIGHTS**
OFFICIAL SEAL

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

PAu 2-468-256

EFFECTIVE DATE OF REGISTRATION
4 / 17 / 00

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1** TITLE OF THIS WORK ▼
Not Without Justice

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See instructions
Screenplay for a Motion Picture

**2** a NAME OF AUTHOR ▼
Kenneth Raymond Heusey

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼
11-11-1964

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR Citizen of ▶ United States
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

b NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

c NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼ Screen Play

**3** a YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2,000 ◀ Year

b DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ Day ▶ Year ▶ ◀ Nation

**4** COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Kenneth Raymond Heusey
181 S. Poinsettia Place
Los Angeles, CA 90036

APPLICATION RECEIVED
APR 17 2000
ONE DEPOSIT RECEIVED
APR 17 2000
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

1

2

EXHIBIT #1

# EXHIBIT #2
## Copyright Application

<div>

EXAMINED BY _____ *MRC*

CHECKED BY

☐ CORRESPONDENCE
Yes

FORM PA

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is "no," go to space 7.
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼    Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a 6**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                          Account Number ▼

**a 7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼
Kenneth Raymond Heusey
181 S. Poinsettia Place
Los Angeles, CA 90036

**b**

Area code and daytime telephone number ▶ (323) 936-0403    Fax number ▶ (323) 936-0403 (*51)
Email ▶ kenheusey@hotmail.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶  ☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Kenneth Raymond Heusey                    Date ▶ 04/06/2000

Handwritten signature (X) ▼
☞  x _____

**Certificate will be mailed in window envelope to this address:**
Name ▼ Kenneth Raymond Heusey
Number/Street/Apt ▼ 181 S. Poinsettia Place
City/State/ZIP ▼ Los Angeles, CA 90036

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
June 1999—200,000   WEB REV: June 1999   ⟲ PRINTED ON RECYCLED PAPER    ☆U.S. GOVERNMENT PRINTING OFFICE: 1998-454-879/98

</div>

EXHIBIT #2

# APPENDIX B
## EXHIBIT #3
## Confidentiality Agreement: Peter Northbourne James/Plaintiff

### *CONFIDENTIALITY AGREEMENT*

This Confidentiality Agreement (this "Agreement") is made effective as of May 16, 2000, between Kenneth Heusey, of 181 S. Poinsettia Place, Los Angeles, California 90036, and Peter James, of 4607 Welch Place, Los Angeles, California 90027.

In this Agreement, the party who owns the Confidential Information will be referred to as "Mr. Heusey", and the party to whom the Confidential Information will be disclosed will be referred to as "Mr. James".

Mr. Heusey is engaged in writing and producing a screenplay, the premise of which is the killing of Christopher Marlowe by William Shakespeare. Mr. James is engaged in supervising digital FX for film production. So that Mr. James can discern which scenes would best utilize digital effects, and subsequently create a preliminary budget for those effects, Mr. Heusey has requested that Mr. James will protect the confidential material and information which may be disclosed between Mr. Heusey and Mr. James. Therefore, the parties agree as follows:

**I. CONFIDENTIAL INFORMATION.** The term "Confidential Information" means any information or material which is proprietary to Mr. Heusey, whether or not owned or developed by Mr. Heusey, which is not generally known other than by Mr. Heusey, and which Mr. James may obtain through any direct or indirect contact with Mr. Heusey.

    A. Confidential Information includes without limitation:
      - business records and plans
      - products
      - copyrights and other intellectual property
      and other proprietary information.

**II. PROTECTION OF CONFIDENTIAL INFORMATION.** Mr. James understands and acknowledges that the Confidential Information has been developed or obtained by Mr. Heusey by the investment of significant time, effort and expense, and that the Confidential Information is a valuable, special and unique asset of Mr. Heusey which provides Mr. Heusey with a significant competitive advantage, and needs to be protected from improper disclosure. In consideration for the disclosure of the Confidential Information, Mr. James agrees to hold in confidence and to not disclose the Confidential Information to any person or entity without the prior written consent of Mr. Heusey. In addition, Mr. James agrees that:

    *i. No Copying/Modifying.* Mr. James will not copy or modify any Confidential Information without the prior written consent of Mr. Heusey.

**EXHIBIT #3**

EXHIBIT #3 (cont'd)

*ii. Application to Employees.* Further, Mr. James shall not disclose any Confidential Information to any employees of Mr. James, except those employees who are required to have the Confidential Information in order to perform their job duties in connection with the limited purposes of this Agreement. Each permitted employee to whom Confidential Information is disclosed shall sign a non-disclosure agreement substantially the same as this Agreement at the request of Mr. Heusey.

*iii. Unauthorized Disclosure of Information.* If it appears that Mr. James has disclosed (or has threatened to disclose) Confidential Information in violation of this Agreement, Mr. Heusey shall be entitled to an injunction to restrain Mr. James from disclosing, in whole or in part, the Confidential Information. Mr. Heusey shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**III. RETURN OF CONFIDENTIAL INFORMATION.** Upon the written request of Mr. Heusey, Mr. James shall return to Mr. Heusey all written materials containing the Confidential Information. Mr. James shall also deliver to Mr. Heusey written statements signed by Mr. James certifying that all materials have been returned within five (5) days of receipt of the request.

**IV. RELATIONSHIP OF PARTIES.** Neither party has an obligation under this Agreement to purchase any service or item from the other party, or commercially offer any products using or incorporating the Confidential Information. This Agreement does not create any agency, partnership, or joint venture.

**V. LIMITED LICENSE TO USE.** Mr. James shall not acquire any intellectual property rights under this Agreement except the limited right to use set out above. Mr. James acknowledges that, as between Mr. Heusey and Mr. James, the Confidential Information and all related copyrights and other intellectual property rights, are (and at all times will be) the property of Mr. Heusey, even if suggestions, comments, and/or ideas made by Mr. James are incorporated into the Confidential Information or related materials during the period of this Agreement.

**VI. GENERAL PROVISIONS.** This Agreement sets forth the entire understanding of the parties regarding confidentiality. Any amendments must be in writing and signed by both parties. This Agreement shall be construed under the laws of the State of California. This Agreement shall not be assignable by either party, and neither party may delegate its duties under this Agreement, without the prior written consent of the other party. The confidentiality provisions of this Agreement shall remain in full force and effect after the effective date of this Agreement.

- 2 -

EXHIBIT #3

## EXHIBIT #3 (cont'd)

Information Owner:
Kenneth Heusey

By: _____
Kenneth Heusey
Producer

Recipient:
Peter James

By: _____
Peter James
Sole Proprietor

- 3 -

**EXHIBIT #3**

63

## EXHIBIT #4

### ANALYSIS OF THE OFFICIAL TRAILER for *Anonymous*

| | |
|---|---|
| 00:07 | Columbia Pictures logo/music |
| 00:10 | New York cityscapes begin/music |
| 00:14 | Backstage/Stage (modern) |
| 00:17 | Audio: "We all know William Shakespeare, the most…" |
| 00:20 | Stage (modern)…pen writing MS…stage<br>Audio: "…famous author of all time. Writer of 37 plays, 154…" |
| 00:25 | Stage (modern)…..pen dipping into inkwell<br>Audio:" …sonnets, several epic poems. And why we are…" |
| 00:30 | stage…. (modern)<br>Audio: "…here today. But if I told you Shakespeare never…" |
| 00:35 | pen writing signature/ signature disappears<br>Audio: "…wrote a single word?" |
| 00:40 | Elizabethan London cityscape/R&J manuscript…ext Globe<br>Audio: music picks up |
| 00:45 | Elizabethan theatre interior (spy looking?)…ms…spy<br>Audio: music continues to end |
| 00:50 | MS…hand on MS…Interior: Oxford turns from<br>      window, (Shakespeaere?) //warships in snow? |
| 00:55 | mobs rushing streets…queen looks concerned |
| 00:60 | someone dies (on stage?)///cannons<br>Audio: cannon blast<br>money exchange<br>title card: "within his words" (ink/blood splash) |
| 01:05 | MS, Queen tosses MS<br>young seductive woman (we can't know who it is)<br>Young man being lead away by soldiers (we can't know who it is) |
| 01:10 | title card:  "between the lines"  (ink/blood splash)<br>Audio: "blast"                    EXHIBIT #4 |

EXHIBIT #4  (cont'd)

Oxford (Shakespeare?) remorseful at the rainy window
Essex beheading


01:15        title card: " lies the truth"     (ink/blood splash)
             Audio: "blade",  and "blasts"

             Oxford(Shakespeare?) traveling on Thames in longboat
             Audio: "You are the soul of the Age"

             helmeted horsemen rushing toward city

01:20        swordsman drawing sword engulfed by flames
             Audio: "none of your poems or your plays will ever…"
             crowd carrying a body, seemingly to torture
             actor rushing crowd
             tortured man in flames
             torch moves quickly to posted playbill

01:25        title card: "this fall"   (ink/blood splash)
             Audio: "…carry your name."
             wide: church…dissolve to funeral (but couldn't know that)
             Audio: "Promise me you'll keep our…"

01:30        Audio: "…secret safe. "
             battle begins on Southampton drawing pistol…troops behind wall fire
             on street: troops…streetlevel  mob fighting/interrogation/ slap! /
             scores of mob/angry anne throws papers across desk/Essex on
             horseback screaming/wide on green maze/ naked back of
             man&young lady going down/CU of his reaction (or is he being
             choked) /chest slammed shut/Queen looking demented/Oxford
             (Shakespeare?) is stabbed

01:35        red/white rose being plucked /groundlings (or mob) cheering
             title card: "we've all been played"  (ink/blood splash)

01:40        Shakespeare takes a bow (but we don't know who it is) as Player
             "royalty "applaud…Jonson looks concerned…

01:45        … Oxford (Shakespeare?) watching,  also looks concerned
             title card: "Anonymous" (ink/blood splash)
01:50        "coming soon"…"credits"

                                                                EXHIBIT #4